# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-4095 GW (FMOx) | Date | August 9, 2013 |
|---|---|---|---|
| Title | *eDrop-Off Chicago LLC, et al. v. Burke, et al.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Kane Tien | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:**    **(IN CHAMBERS:) RULING ON SPECIAL MOTION TO STRIKE PLAINTIFFS' COMPLAINT WITH REQUEST FOR FURTHER BRIEFING ON SINGLE ISSUE** (file 07/09/12)

The order is attached hereto.

                                                    :

Initials of Preparer    KTI

***eDrop-Off Chicago LLC, et al. v. Burke, et al.***, Case No. 2:12-cv-04095 GW (FMOx)
Ruling on Special Motion to Strike Plaintiffs' Complaint with request for further briefing
on single issue

This case has been a case study in strategic procedural maneuvers – some shrewd and some, perhaps, ill-advised. The present proceeding maintains that hallmark.

Now pending before the Court is a special motion to strike pursuant to California Code of Civil Procedure § 425.16 filed by defendant Midley, Inc. dba Purseblog.com ("Midley" or "PurseBlog").[1]  Midley first filed an anti-SLAPP motion on July 9, 2012. *See* Docket No. 48.  Plaintiffs eDrop-Off Chicago LLC ("eDrop-Off") and Corri McFadden (collectively, "Plaintiffs") filed an Opposition on July 19, 2010.  *See* Docket No. 57.  In connection with that motion and a request by Plaintiffs to be allowed to

---

[1] By the time briefing was complete on this motion, Midley's motion had begun, in certain respects, to resemble a Rule 12(b)(6) motion.  This made some sense in light of the federal court limitations on anti-SLAPP motions which could work to limit a court's consideration of such a motion to the face of the pleadings (and other Rule 12(b)(6)-permissible materials).  Midley cannot rely on that limitation, however, to suddenly transform its anti-SLAPP motion into an actual Rule 12(b)(6) motion with respect to claims – such as Plaintiffs' Lanham Act and declaratory relief claims – that are unquestionably *not* subject to its anti-SLAPP motion.

Midley originally filed the motion solely as an anti-SLAPP motion.  *See* Docket No. 48, at i:5-9.  At a May 20, 2013, hearing held in connection with this motion, Midley's counsel asserted that he had earlier sought leave to address the First Amended Complaint in an updated way, including under Rule 12.  *See* May 20, 2013 Transcript at 7:11-8:2.  The Court is unclear concerning when, in particular, Midley's counsel claims to have requested leave to move for relief under Rule 12, but if the October 29, 2012, hearing is what he is referring to, the Court would not share his view of that proceeding.  *See, e.g.*, Docket No. 97, at 19:8-18, 23:25-24:8, 26:5-7.  If, instead, Midley perceived such permission from the Court by way of the Court's reference to Rule 12(b) standards in its August 9, 2012, tentative ruling, *see* Docket No. 104, at 2:1-2 and Docket No. 83, Midley misperceived the message therein conveyed.  The briefing suggested that Midley was referencing Rule 12 and its standards because it (correctly) believed it likely that the Court would limit any anti-SLAPP analysis to one performed under a Rule 12(b)(6)-type standard.  *See, e.g.*, Docket No. 101, at 2:19-21 ("Although Purseblog originally moved for dismissal under the anti-SLAPP statute *with supporting evidence*, the motion may be granted with respect to both the original and amended complaints pursuant to Rule 12(*obviating the need for discovery* and force Purseblog to incur additional fees needlessly in this SLAPP lawsuit.") (emphasis added); *id.* at 24:23-25:2; Docket No. 103, at 2:8-9 ("With discovery looming, Purseblog tries a new tactic to challenge the FAC.  It urges the Court to adopt a Rule 12(b)(6) standard….."); *id.* at 4:2-4; *id.* at 5:14-16; *id.* at 7:5-6.

If, however, the Court is mistaken in its impression and Plaintiffs agree that the Court can treat the instant motion as a fully-briefed Rule 12(b)(6) motion in addition to an anti-SLAPP motion, the Court can issue an additional ruling addressing the viability of the claims under that Rule.  If Plaintiffs do not agree in this regard, and if Midley truly believes it has fully addressed the claims under Rule 12(b)(6), it presumably will not be difficult for Midley to file a true Rule 12(b)(6) motion (or motion for judgment on the pleadings) in short order.  Midley may, however, need to consider now whether the scope of any Rule 12(b)(6)/12(c) motion should, as a result of the instant ruling, extend beyond a challenge to Plaintiffs' Lanham Act claim.

amend their Complaint, the Court concluded that application of California's anti-SLAPP law without allowing Plaintiffs to amend (or take discovery) would conflict with Rules 15 and 56 of the Federal Rules of Civil Procedure. *See* Docket Nos. 83, 92. It therefore allowed Plaintiffs to file a First Amended Complaint ("FAC"), which Plaintiffs did on November 6, 2012. *See* Docket Nos. 92, 96. Following that filing, the parties submitted further briefing designed to update Midley's anti-SLAPP motion and to take into consideration the new landscape of the case presented by the FAC. *See* Docket Nos. 101, 103-04.

I. <u>Anti-SLAPP as to Now-Superseded Original Complaint</u>

As the above-discussion should make clear, this case has changed since the time when Midley filed its original anti-SLAPP motion. For one thing, whereas the Court was at least initially under the impression that Plaintiffs' original Complaint presented claims brought under California law, *see* Docket No. 36, at 4, Plaintiffs' FAC includes two claims brought under federal law and two claims brought under Illinois statutes – a Lanham Act claim, an Illinois Uniform Deceptive Trade Practices Act claim, an Illinois Consumer Fraud and Deceptive Business Practices Act claim, and a declaratory relief claim referencing 28 U.S.C. §§ 2201-2202. The FAC also contains common law claims for defamation, trade libel, intentional interference with contractual relations, intentional interference with prospective economic advantage, breach of contract, promissory estoppel and intentional infliction of emotional distress.

One of Midley's responses to the change in Plaintiffs' allegations is to argue that Plaintiffs' *amendment* of their allegations is the effective equivalent of having *dismissed* their original claims that were the target of Midley's original anti-SLAPP motion. Where a plaintiff *voluntarily dismisses* an action after a defendant files an anti-SLAPP motion in California state court, the court still may award attorney's fees and costs under the anti-SLAPP statute's fee provision. *See Law Offices of Andrew L. Ellis v. Yang*, 178 Cal.App.4th 869, 879 (2009) (noting that, where a party dismisses its case while a motion to strike is pending, "the trial court is given the limited jurisdiction to rule on the merits of the motion in order to decide if it should award attorney fees and costs to the defendants"); *Moore v. Liu*, 69 Cal.App.4th 745, 751 (1999) ("[A] defendant who is voluntarily dismissed, with or without prejudice, after filing a section 425.16 motion to

strike, is nevertheless entitled to have the merits of such motion heard as a predicate to a determination of the defendant' motion for attorney's fees and costs under subdivision (c) of that section."); *see also* Weil & Brown, <u>California Practice Guide:  Civil Procedure Before Trial</u> ("<u>Weil & Brown</u>") (2011), § 7:1122, at 7(II)-56.[2]  Moreover, even if the status of this case was considered more akin to a situation where a case is dismissed *by the court* prior to the hearing on the anti-SLAPP motion, fees would still be available in that circumstance as well.  *See ARP Pharm. Servs., Inc. v. Gallagher Bassett Servs., Inc.*, 138 Cal.App.4th 1307, 1323 (2006); *Moraga-Orinda Fire Protection Dist. v. Weir*, 115 Cal.App.4th 477, 480 (2004); *White v. Lieberman*, 103 Cal.App.4th 210, 220 (2002); *Pfeiffer Venice Props. v. Bernard*, 101 Cal.App.4th 211, 218 (2002); *see also* <u>Weil & Brown</u> (2011), § 7:1124, at 7(II)-56 – 57; *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110-11 (9th Cir. 2003).

The question is whether a plaintiff's *permissive amendment* of allegations should be treated differently.  The California state courts have not confronted this question because amendment in the face of an anti-SLAPP motion is not permitted in California state court either before or after the pending anti-SLAPP motion is heard, at least where the plaintiff is unable to demonstrate a probability of prevailing on the merits of the claims as they are pled in the *original* complaint.  *See* <u>Weil & Brown</u> (2011), §§ 6:665.5-665.6, at  6-170; *id.* §§ 7:1076-1076.5, at 7(II)-52; *South Sutter, LLC v. LJ Sutter Partners, L.P.*, 193 Cal.App.4th 634, 666-67 (2011); *Schaffer v. City & Cnty. of San Francisco*, 168 Cal.App.4th 992, 1005 (2008); *Salma v. Capon*, 161 Cal.App.4th 1275, 1280, 1293-94 (2008); *Simmons v. Allstate Ins. Co.*, 92  Cal.App.4th 1068, 1073-74 (2001); *see also Nguyen-Lam v. Cao*, 171 Cal.App.4th 858, 863, 868-71 (2009) ("Where

---

[2] But an award of fees in that circumstance is not automatic or mandatory – the court is essentially asked to consider the merits of the anti-SLAPP motion even though it no longer has jurisdiction to actually rule on the motion.  *See Moore v. Liu*, 69 Cal.App.4th 745, 753 (1999) ("[A] plaintiff's voluntary dismissal of a suit, after a section 425.16 motion to strike has been filed, neither automatically precludes a court from awarding a defendant attorney's fees and costs under that section, nor automatically requires such an award."); *see also South Sutter, LLC v. LJ Sutter Partners, L.P.*, 193 Cal.App.4th 634, 663-64 (2011); *Law Offices of Andrew L. Ellis v. Yang*, 178 Cal.App.4th 869, 879 (2009); *Coltrain v. Shewalter*, 66 Cal.App.4th 94, 107 (1998) ("We conclude that where the plaintiff voluntarily dismisses an alleged SLAPP suit while a special motion to strike is pending, the trial court has discretion to determine whether the defendant is the prevailing party for purposes of attorney's fees under…section 425.16[(c)]."); Weil & Brown, <u>California Practice Guide:  Civil Procedure Before Trial</u> ("<u>Weil & Brown</u>") (2011), § 7:1123-1123.3, at 7(II)-56.  *But see Pfeiffer Venice Props. v. Bernard*, 101 Cal.App.4th 211, 218 (2002) (disagreeing with *Coltrain* to the extent *Coltrain* indicated trial court has *discretion* to determine whether defendant is prevailing party for purposes of anti-SLAPP statute).

the evidence submitted for the motion enables the plaintiff to demonstrate the requisite probability of prevailing on the merits of her defamation claim, the policy concerns against amendment in the anti-SLAPP context do not apply because the plaintiff's suit – shown to be likely meritorious – is not a strategic lawsuit against public participation."); *id.* at 871-72 ("True, a plaintiff may not avoid or frustrate a hearing on the anti-SLAPP motion by filing an amended complaint but where, as here, the evidence prompting amendment is found in the declarations already submitted for the hearing, there is no risk the purpose of the strike procedure will be thwarted with delay, distraction, or increased costs."). *But see Law Offices of Andrew L. Ellis*, 178 Cal.App.4th at 881 ("*Simmons* did not hold that parties lose their right to amend a pleading upon the filing of an anti-SLAPP motion by the opposition. Rather, *Simmons* stated that parties lose that right *after a court has made an adverse* ruling by finding the moving party met its burden of proof and finding a prima facie showing has been made.").[3] In contrast, in federal court the opportunity for amendment is not foreclosed (or even limited to the circumstances presented in *Nguyen-Lam*). *See Verizon Del., Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004) (reaching conclusion that opportunity for amendment in federal court is necessary in order to avoid conflict between California's anti-SLAPP statute and Fed. R. Civ. P. 15(a) and noting that "the purpose of the anti-SLAPP statute, the early dismissal of meritless claims, would still be served if plaintiffs eliminated the offending claims from their original complaint").

As if the issue were not complicated enough, the Court already rejected Plaintiffs' efforts to voluntarily dismiss this action against Midley so that they could litigate the case in Illinois. *See* Docket No. 42. It reached that conclusion because of its determination that Midley would suffer "plain legal prejudice" were Plaintiffs allowed to voluntarily dismiss this case so as to allow for it to be litigated in Illinois, because Midley likely would be unable to take advantage of any anti-SLAPP law (either California's or

---

[3] The California courts *have* confronted the situation where amendment occurs, not by way of a court's permission, but *as of right*, while an anti-SLAPP motion is pending. In that circumstance, the court still resolves the anti-SLAPP motion filed in connection with the now-defunct version of the complaint for purposes of resolving the question of anti-SLAPP fees and costs. *See Sylmar Air Conditioning v. Pueblo Contracting Servs., Inc.*, 122 Cal.App.4th 1049, 1055-56 (2004); *cf. Salma v. Capon*, 161 Cal.App.4th 1275, 1294 (2008) (indicating that "automatic dismissal" of amended claims is appropriate where plaintiff amends complaint before court rules on first anti-SLAPP motion).

Illinois's) in an Illinois forum.  *See* Docket Nos. 36, 42-1.[4]  At the same time, when it reached that "plain legal prejudice" conclusion, the Court indicated that it felt that the loss of the *ability to move for attorney's fees* due to a voluntary dismissal would not, by itself, constitute "legal prejudice" to Midley.  *See* Docket No. 36, at 5-6 ("Midley also point [*sic*] to the deprivation of its ability to move for an award of attorney's fees under California's anti-SLAPP law based upon a voluntary dismissal if indeed Plaintiffs are allowed to voluntarily dismiss the case in order to purse relief in Illinois….  Were the Court required to assess whether this alone could constitute sufficient 'legal prejudice,' it would conclude that it could not.").

What few hints the Ninth Circuit has given about the availability of an anti-SLAPP motion, for purposes of a fee award, as to a now-superseded version of the complaint suggest that this course of action is *not* available.  After all, in *Verizon*, the Ninth Circuit wrote "*[i]f the offending claims remain in the first amended complaint, the anti-SLAPP remedies remain available to defendants.*"[5]  *Verizon*, 377 F.3d at 1091 (emphasis added); *see also Vess*, 317 F.3d at 1102, 1110 (agreeing with district court that ruling on anti-SLAPP motion would be "premature" where amendment would be forthcoming); *IDEC Corp. v. Am. Motorists Ins. Co., Inc.*, No. C 02-1723 JF (RS), 2006 U.S. Dist. LEXIS 57975, *5-7 (N.D. Cal. Aug. 7, 2006).  If it did not matter whether the amended complaint itself contained claims that were subject to the anti-SLAPP statute, the Ninth Circuit would not have written that sentence.  For that reason, if tasked with confronting the question, the Court would not resolve any anti-SLAPP motion, even if only for purposes of fee recovery, as to the *original* Complaint in this case.  *See Brown v. Elec. Arts, Inc.*, 722 F.Supp.2d 1148, 1154-57 (C.D. Cal. 2010) (rejecting request for fees on successful anti-SLAPP motion with respect to initial complaint where leave was

---

[4] This "plain legal prejudice" ruling simply meant that Midley still had the opportunity to argue for application of, and success under, California's anti-SLAPP statute.  The voluntary dismissal-related proceedings were by no means a guarantee that Midley would *successfully* argue that California's anti-SLAPP statute could apply under the circumstances of this case, much less that it would prevail on the "merits" of such an anti-SLAPP motion.

[5] In light of that sentence, Midley should consider explaining its assertion that *Verizon* "merely held that granting a defendant's anti-SLAPP motion without leave to amend was inconsistent with federal procedure under rule 15, <u>but did not rule on whether a plaintiff would nonetheless be subject to anti-SLAPP liability as a consequence of amendment</u>."  Docket No. 104, at 5:11-14 (emphasis added).

granted and plaintiff re-asserted same state claims in amended complaint).[6]

In Footnote 2 of its "Addendum" brief, Midley cites several federal district court cases, along with *ARP Pharmacy Services* and *Sylmar Air Conditioning*, as support for the proposition that "[b]oth California and federal courts within the Ninth Circuit have ruled that a plaintiff cannot avoid anti-SLAPP liability by simply amending its complaint to drop claims that were the subject of a pending motion to strike."  Docket No. 101, at 4:1-3 & n.2; *see Art of Living Found. v. Does 1-10*, No. 5:10-cv-05022-LHK, 2012 U.S. Dist. LEXIS 61582, *73-77 (N.D. Cal. May 1, 2012); *Plevin v. City & Cnty. of San Francisco*, 2011 U.S. Dist. LEXIS 83285, *12-13 (N.D. Cal. July 29, 2011); *Applied Med. Sys., Ltd. v. English*, No. 10cv1811 BEN (BLM), 2011 U.S. Dist. LEXIS 142073, *2-7 (S.D. Cal. Dec. 9, 2011); *Greenberg v. Murray*, No. SACV 10-375 AG (CTx), 2010 U.S. Dist. LEXIS 69725, *9-10 (C.D. Cal. June 14, 2010).  *None* of those cases consider *Verizon* (or at least the portion of it quoted above[7]), which, as a reported Ninth Circuit decision, is seemingly binding on this Court.  Unless Midley can direct the Court to some authority indicating that it – a district court, *cf., e.g., Wolfson v. Watts (In re Watts)*, 298 F.3d 1077, 1082-83 (9th Cir. 2002) (explaining when *a Ninth Circuit panel* can revisit an issue of state law an earlier panel has already decided) – is to *ignore* Ninth Circuit precedent on an issue of state law in favor of later[8] state intermediate appellate decisions (not a state *supreme court* decision) answering a question a different way – a state of

---

[6] On October 29, 2012, the Court, after emphasizing that this issue was "something I have not ruled on and I don't know what the effect of it is," stated that it "would *presume – without having done any investigation or research myself*,…that the mere fact that you dismiss those causes of action under the substantive law which is the California SLAPP law that you can't get around SLAPP sanctions for that."  Docket No. 97, at 7:21-8:7 (emphasis added); *see also id.* at 8:22-9:4 ("The question is what is the affect [*sic*] later on of having allowed them to amend to get rid of those claims.  It is what it is.  If in fact under California law or if in fact if the federal law were to somehow supersede the California law in this area and say, well, they could still amend and not be penalized for the SLAPP aspects, well, if that in fact is the law, then, hey, that's the law.  But I don't know what the law is at this point.").  The Court's comments should have made it pellucid that such views were, at the very least, preliminary.

[7] *Applied Medical Systems* quotes *Verizon* for the simple undisputed proposition that anti-SLAPP motions are available in federal court and that defendants are entitled to fees and costs when they prevail on such a motion.  *See Applied Medical Systems*, 2011 U.S. Dist. LEXIS 142073, *3.  *Greenberg* cites *Verizon* as support for giving the plaintiff leave to amend.  *See Greenberg*, 2010 U.S. Dist. LEXIS 69725, *9.

[8] In fact, the only state appellate court decision (*i.e. Plevin*) relied on by Midley *pre-dated Verizon*, meaning that it could not possibly cause this Court or a later three-judge Ninth Circuit panel to deviate from *Verizon*.  *See Plevin*, 2011 U.S. Dist. LEXIS 83285, *12-13.

affairs different from the question of what should happen when there is *no* Ninth Circuit precedent on a question of state law and the federal court is tasked with predicting whether or not the state supreme court would follow the state intermediate appellate courts' approach, *see, e.g.*, *McGregor v. Paul Revere Life Ins. Co.*, 369 F.3d 1099, 1101 (9th Cir. 2004) – this Court does not find those decisions cited in Footnote 2 of Midley's "Addendum" brief to be persuasive.[9]

Of course, this entire question of whether Midley should be awarded fees under California Code of Civil Procedure § 425.16(c) with respect to the initial complaint would be pointless in any respect if Midley is able to successfully demonstrate an entitlement to fees in connection with the FAC.  It is to that analysis, therefore, that the Court now turns.

II.  Anti-SLAPP Directed at the FAC

The next question that must be answered in the lead-up to performing an anti-SLAPP analysis is whether California's anti-SLAPP law (the only one Midley has attempted to use in its motion) would even apply to Plaintiffs' claims.  Plaintiffs argue

---

[9] *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988), could be viewed as just such a decision. There, the Ninth Circuit agreed with the Tenth Circuit, which had ruled that a district court erred by not reconsidering (because of an intervening state appellate court decision) an issue of state law that had already been decided on a prior appeal in the same case (thereby presenting a law of the case question). *See also Johnson v. Symantec Corp.*, 58 F.Supp.2d 1107, 1111 (N.D. Cal. 1999) (suggesting that a federal circuit court of appeal's "prediction of state law is not binding in the same way as is its definitive interpretation of federal law," though "as a practical matter a circuit court's interpretations of state law must be accorded great deference by district courts within the circuit").  Yet, here, the *Verizon* decision itself was *premised* on the existence of *Erie* problems given the conflict with the Federal Rules of Civil Procedure that would result from a strict application of California's anti-SLAPP statute.  Later California appellate decisions – such as *ARP Pharmacy Services* and *Sylmar Air Conditioning* – obviously have no reason to consider *Erie* questions such as those facing the *Verizon* court.  Thus, even if *Verizon* was *then* wrong, or should *now* be considered to be wrong, about California law, it is not at all clear that this would affect the Ninth Circuit's approach to the issue.

Of course, *Verizon* principally considered the availability of amendment, not the continued pursuit of a fee motion under the anti-SLAPP statute.  Nevertheless, considering all of the variables that a court would itself have to consider for purposes of determining whether *Verizon* was still good law (*Art of Living*, *Plevin*, *Applied Medical Systems* and *Greenberg* having considered none of them, in light of their failure to even acknowledge *Verizon* and/or to consider the quoted portion this Court highlights), this Court feels that it is the Ninth Circuit that is best-suited to decide that question.  *See generally Ceron v. Holder*, 712 F.3d 426, 430-32 (9th Cir. 2013); *id.* at 435 & n.4 (Ikuta, J., dissenting); *Wolfson v. Watts (In re Watts)*, 298 F.3d 1077, 1083-87 (9th Cir. 2002) (O'Scannlain, J., concurring) ("We also permit our panels to use the big eraser when the earlier decision is based on state law that has demonstrably changed in the intervening period.  Herein lies the rub.  A proposition's demonstrability depends on the audience's receptivity.  How skeptical must we ask our panels to be when they are urged to exercise the power to overrule in light of a supervening change in the underlying law?").  As a result, it will continue to follow what it understands is Ninth Circuit precedent on this question.

that California's anti-SLAPP statute does not apply to claims under federal law or to the two claims they have specifically asserted under Illinois statutory law.  They also allege that the remaining state law claims – at least claims 4 through 10 – should be interpreted under Illinois law because of choice of law principles.

     A.  <u>Lanham Act and Declaratory Relief</u>

The answer is simplest with respect to Plaintiffs' two federal claims.  Midley could not prevail on its anti-SLAPP motion insofar as Plaintiffs' Lanham Act and declaratory relief claims are concerned because "the anti-SLAPP statute does not apply to federal law causes of action" (at least in federal court).  *Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010); *see also Nunag-Tanedo v. East Baton Rouge Parish Sch. Bd.*, 711 F.3d 1136, 1141 (9th Cir. 2013).  *But see cf. Vergos v. McNeal*, 146 Cal.App.4th 1387, 1392 (2007) ("Federal civil rights claims brought in California state courts are subject to section 425.16 motions."); *Bradbury v. Superior Court (Spencer)*, 49 Cal.App.4th 1108, 1117-18 (1996).

     B.  <u>Illinois Statutory Claims</u>

The question is slightly more complicated with respect to the FAC's two claims for violation of Illinois statutes.  While it is true that this Court obviously sits within the State of California, Plaintiffs' two state statutory claims are plainly based on Illinois statutes, and involve conduct that has, as its only connection to California, the fact that it involved speech over the Internet and the Internet, of course, is accessible in – and viewable by residents of – California.  Under California's choice of law rules, to which this Court looks, *see Paulsen v. CNF Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009), California will apply its own rule of decision unless a party invokes the law of a foreign state that 'will further the interest of the foreign state and therefore that is an appropriate one for the forum to apply to the case before it."  *Id.*  Insofar as eDrop-Off is an Illinois limited liability company and McFadden is an Illinois resident and citizen, Illinois's interests would plainly be furthered by Plaintiffs' plain invocation and attempted enforcement of the Illinois statutes at issue here.  *Cf. Tylka v. Gerber Prods. Co.*, 182 F.R.D. 573, 577-78 (N.D. Ill. 1998); *compare Potomac Leasing Co. v. Chuck's Pub, Inc.*, 509 N.E.2d 751, 759 (Ill. App. Ct. 1987) (refusing to apply Illinois Consumer Fraud and Deceptive Business Practices Act because court did "not believe that there is a

sufficiently strong or fundamental public policy interest to justify overriding *the parties choice* [*sic*] of Michigan law to govern the agreement") (emphasis added).

Midley contends that Plaintiffs should be estopped from arguing that Illinois's laws apply to this case by virtue of application of judicial estoppel.  But as Midley itself admits, application of judicial estoppel requires that the party against whom it is asserted gained an advantage by asserting an earlier position and then later sought to gain yet another advantage by taking a clearly inconsistent position.  Midley has not explained how Plaintiffs gained any advantage from their earlier seeming invocation of California law.

Midley also argues that the Court should not "reconsider" its prior ruling – presumably meaning the ruling that the claims in the original Complaint were claims under California law.  By considering a later version of a complaint, which on its face alleges two Illinois statutory claims that simply were not in the original Complaint, the Court is not *reconsidering* – nor, obviously, "*relitigating*," Docket No. 101, at 7:2 – a ruling it made in connection with the original Complaint.

Apart from an abbreviated assertion that California law would apply here even if the Court were to "reconsider" or "relitigate" its earlier ruling that Plaintiff's original claims were California law claims, Midley advances no sustained effort to argue that Plaintiffs' two Illinois statutory claims should be analyzed by way of California's anti-SLAPP statute.  Whatever the Court might conclude about Plaintiffs' common law claims in the FAC, Midley has directed the Court to no case that stands for the proposition that claims based upon the *statutory law* of a foreign state should be analyzed by way of California's anti-SLAPP statute.  The one case Midley does cite for its assertion that California's anti-SLAPP statute should apply regardless of the source of applicable substantive law, *Deutsch v. Turner Corp.*, 324 F.3d 692 (9th Cir. 2003), which involved the question of whether or not to apply California's statutes of limitation, did not appear to have involved any *statutory* claims explicitly brought under some other state's[10] laws.

---

[10] *Deutsch did* involve claims under the Alien Tort Claims Act, and the Ninth Circuit applied *that statute's* limitations period as to those claims.  *See Deutsch*, 324 F.3d at 717.  Notwithstanding the fact that it does not appear any foreign state statutory claims were involved in *Deutsch*, at least one district court has read that case to apply to situations where foreign state statutes were involved.  *See Virginia v. McKesson Corp.*, No. C 11-02782 SI, 2013 U.S. Dist. LEXIS 46999, *5 (N.D. Cal. Mar. 28, 2013).  To the extent that decision was based, in that regard, solely on *Deutsch*, this Court disagrees with it.

*See id.* at 704-06, 716; *Theranos, Inc. v. Fuisz Pharma LLC*, 876 F.Supp.2d 1123, 1130-31 (N.D. Cal. 2012) ("In *Deutsch*, the Ninth Circuit specifically addressed choice-of-law issues in applying the statute of limitations for state common law claims.").  The same is true with respect to the Second Circuit's recent decision in *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138 (2d Cir. 2013) – a case that will be discussed in further detail *infra* – although the Court reads that case to strongly support the conclusion that California anti-SLAPP law should be applied to the common law claims here notwithstanding any potential choice or conflict of law issues, that case did not consider claims permissibly brought under a foreign state's statutes.

Plaintiffs assert that Midley "concedes" that California's anti-SLAPP statute does not cover Plaintiffs' Illinois statutory claims.  *See* Docket No. 103, at 8:16-9:4.  The Court does not believe that Midley goes quite that far (as Midley confirms in its last brief on this motion, *see* Docket No. 104, at 8:17-9:5).  Nevertheless, apart from Midley's unconvincing citation to *Deutsch* and its misapplied stabs at having the Court apply notions of judicial estoppel or principles applicable to the "law of the case" doctrine and/or a court's ability to "reconsider" its own interlocutory decisions in a case, Midley's argument in its "Addendum" brief goes no further.  In its final brief on the subject, Midley provides no further reason for applying California's anti-SLAPP statute to Plaintiffs' Illinois claims, other than by way of attempting to distinguish *Schering Corp. v. First Databank, Inc.*, No. C 07-1142 WHA, 2007 U.S. Dist. LEXIS 50164 (N.D. Cal. Apr. 20, 2007), a case upon which Plaintiffs attempt to rely and which is discussed *infra*.

One might conclude that would be the end of the story, and on that showing the Court would *not* apply California's anti-SLAPP statute to Plaintiffs' two Illinois statutory claims.  However, the Court must account for the wrinkle that is in play because of a particular aspect of California's choice of law rules.[11]   Under California's approach,

---

[11] Where a plaintiff has affirmatively chosen the statute(s) of a particular state as the basis for one or more of his, her or its claims, it is seemingly, at a minimum, a little strange to consider choice of law or conflicts of law issues.  The logical presumption is that it makes little sense to apply anything other than the chosen state's law to the state statute at issue.  Yet, at least one district court case employing California's governmental interest analysis has engaged in a choice of law examination, notwithstanding the plaintiff's selection of a particular state's – there, California's – statute upon which to base its claim.  *See Axis Reinsurance Co. v. Telekenex, Inc.*, 913 F.Supp.2d 793, 805 (N.D. Cal. 2012).  In that case, the court ultimately determined that the plaintiff's choice of a California statute was appropriate – California law applied under a choice of law analysis.  *See id.* at 805-06.

conflicts/choice of law analyses typically must be conducted for *each* issue in a case.  *See Beech Aircraft Corp. v. Superior Court (Aanestad)*, 61 Cal.App.3d 501, 518-19 (1976) (indicating that governmental interest analysis must be conducted with respect to each issue); *see also S.A. Empresa de Viacao Aerea Rio Grandense v. Boeing Co.*, 641 F.2d 746, 749 (9th Cir. 1981) ("A separate choice-of-law inquiry must be made with respect to each issue in a case.") (applying California choice-of-law analysis); *Ribbens Int'l, S.A. de C.V. v. Transport Int'l Pool, Inc.*, 47 F.Supp.2d 1117, 1120 (C.D. Cal. 1999) ("[U]nder California conflict of law principles, the Court is obligated to conduct a separate choice-of-law analysis as to each issue presented for decision.").  "As a default, the law of the forum state will be invoked, and the burden is with the proponent of foreign law to show that the foreign rule of decision will further the interests of that state."  *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1142 (9th Cir. 2010).

There is some reason to question, however, whether application of an anti-SLAPP statute is the type of question such an analysis is even designed to deal with. Specifically, the analysis usually manages problems with determining which of one or more states' *substantive* laws would apply to a case.  To wit,

California applies the "governmental interest" approach to conflicts issues…. *Id.*  Under this approach,

> (1) the court examines the substantive laws of each jurisdiction to determine whether the laws differ as applied to the relevant transaction, (2) if the laws do differ, the court must determine whether a true conflict exists in that each of the relevant jurisdictions has an interest in having its law applied, and (3) if more than one jurisdiction has a legitimate interest ... the court [must] identify and apply the law of the [jurisdiction] whose interest would be more impaired if its law were not applied.  Only if both [jurisdictions] have a legitimate but conflicting interest in applying its own law will the court be confronted with a "true conflict" case.

*Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 610 (9th Cir. 2010) (underline added) (quoting *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001); *see also CRS Recovery*, 600 F.3d at 1141 ("When a federal court sits in diversity to hear state law claims, the conflicts laws of the forum state – here California – are used to determine which state's substantive law applies.") (emphasis added); *Zinser v.*

*Accufix Research Institute, Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001) ("A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling <u>substantive</u> law.") (emphasis added); *Arno v. Club Med Boutique Inc.*, 134 F.3d 1424, 1425 (9th Cir. 1998) ("A substantive choice of law analysis is required…only if the availability of attorneys' fees is considered to be a substantive rather than a procedural issue under California law."); *Boaz v. Boyle & Co.*, 40 Cal.App.4th 700, 713 (1995) ("The circumstances of this case – including the site of the tortious acts and their manifestation, and the lack of a significant California connection to those events – provide strong reasons to believe that a California court would look to the substantive law of New York."); *Hambrecht & Quist Venture Partners v. Am. Med. Int'l, Inc.*, 38 Cal.App.4th 1532, 1541 (1995) (remarking, in case involving contractual choice of law provision, that "some conflict of laws cases have distinguished between 'procedural' and 'substantive' law").

Of course, if California's anti-SLAPP law falls on the procedural side of the substantive-procedural divide, this only suggests further that California's anti-SLAPP statute *would* apply here, even to Plaintiffs' Illinois statutory claims. "It is true that while courts generally enforce substantive rights created by the laws of other jurisdictions, procedural laws of the forum state are to be applied." *Roberts v. Home Ins. Indem. Co.*, 48 Cal.App.3d 313, 318 (1975); *see also World Wide Imports, Inc. v. Bartel*, 145 Cal.App.3d 1006, 1012 (1983) ("It is well established that while the courts generally enforce the substantive rights created by the laws of other jurisdictions, the procedural matters are governed by the law of the forum. As defined in the case law, the terms 'practice' and 'procedure' include the mode of procedure by which a legal right is enforced as distinguished from the substantive law which gives or declares the right.").

Yet, even the basic question these observations pose is not easily resolved here because there is *zero* consistency in the case law with respect to whether California's anti-SLAPP statute is a substantive law or a procedural device. Though the California Supreme Court has labeled it only a "procedural device," the Ninth Circuit has frequently (even subsequent to the California Supreme Court's characterization) referred to California's anti-SLAPP statute as a "substantive" statute. *See, e.g.*, *DC Comics v. Pacific Pictures Corp.*, 706 F.3d 1009, 1016 (9th Cir. 2013); *U.S. ex rel. Newsham v.*

*Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 971, 973 (9th Cir. 1999). *But see Kibler v. N. Inyo Cnty. Local Hosp. Dist.*, 39 Cal.4th 192, 201-02 (2006) ("The [§ 47(b)] privilege is a substantive rule of law, whereas the anti-SLAPP statute is a procedural device to screen out meritless claims.")[12]; *Liberty Synergistics*, 718 F.3d at 148 n.9; *id.* at 152 ("Classification of a law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor, but perhaps even more confounding is the fact that a state's 'procedural' rules under its own choice-of-law principles can be 'substantive' for purposes of *federal* diversity jurisdiction.") (omitting internal citation and quotation marks) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)). At times, that has merely been an observation made in the course of considering an *Erie* question. *See CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1111 (9th Cir. 2007); *Batzel v. Smith*, 333 F.3d 1018, 1025-26 (9th Cir. 2003); *Newsham*, 190 F.3d at 973. At other times, the Ninth Circuit has observed that California's anti-SLAPP statute has *both* procedural and substantive components. *See Verizon*, 377 F.3d at 1091; *Newsham*, 190 F.3d at 971. At still other times, the Ninth Circuit has characterized California's anti-SLAPP statute – specifically section 425.16(b)'s special motion to strike vehicle itself and the availability of fees and costs under section 425.16(c) – as "California procedural rules." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 845 (9th Cir. 2001) (summarizing *Newsham*). Making this discussion and analysis even murkier for present purposes, *none* of these discussions involved choice/conflict of law questions.

---

[12] *Kibler* is not the only example of the California courts reaching this conclusion. *See Soukup v. Law Offices of Herbert Hafif*, 39 Cal.4th 260, 280 (2006) ("The anti-SLAPP statute is a procedural statute, the purpose of which is to screen out meritless claims."); *Rusheen v. Cohen*, 37 Cal.4th 1038, 1055-56 (2006) ("The Legislature enacted Code of Civil Procedure section 425.16 – known as the anti-SLAPP statute – to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights."); *Chodos v. Cole*, 210 Cal.App.4th 692, 700 (2012); *Tuszynska v. Cunningham*, 199 Cal.App.4th 257, 265 (2011); *Jocer Enters., Inc. v. Price*, 183 Cal.App.4th 559, 575 (2010) ("Here, the filing of a defensive anti-SLAPP motion by appellants' counsel would not constitute malicious prosecution, as subsidiary procedural actions or purely defensive actions cannot be the basis for malicious prosecution claims.") (omitting internal quotation marks); *Ingels v. Westwood One Broad. Servs.*, Inc., 129 Cal.App.4th 1050, 1061 (2005) ("Section 425.16 provides a procedural remedy to a party who perceives that an action qualifies as a strategic lawsuit against public participation (SLAPP)."); *Bouley v. Long Beach Mem'l Med. Ctr.*, 127 Cal.App.4th 601, 613 (2005) ("[W]hen Code of Civil Procedure section 425.16, the anti-SLAPP statute, was enacted, it was applied to pending cases as a procedural statute, as was a change in the anti-SLAPP law, which removed certain claims from the ambit of that law and deprived a defendant of a defense which existed at the time the case was filed."); *Physicians Comm. for Responsible Med. v. Tyson Foods, Inc.*, 119 Cal.App.4th 120, 127 (2004) (cataloging decisions construing section 425.16 as procedural statute); *Paul v. Friedman*, 95 Cal.App.4th 853, 862 (2002).

Equally illustrative of either a clear (though unstated) answer or a distinct (though unstated) unwillingness to wade into this morass, a Westlaw search of all published California Supreme Court and California Court of Appeal decisions uncovers *zero* published cases in which those courts have undertaken a "governmental interest" choice/conflict of law analysis in connection with California's anti-SLAPP statute. In the end, therefore, it is far from clear just how, if at all, California's governmental interest analysis would work in the application of California's anti-SLAPP statute to statutory claims that are unquestionably brought pursuant to another state's statutes.

Notwithstanding the above-delineated confusion, it is quite possible that this governmental interest query is a red herring, with little effect or meaning other than *vis a vis* an academic one. Two district courts have considered application of California's anti-SLAPP statute to events having either very little or nothing to do with California; both concluded that it simply would not apply.

In *Competitive Technologies v. Fujitsu Ltd.*, 286 F.Supp.2d 1118 (N.D. Cal. 2003), the court made use of choice of law rules (both California's and Illinois's, because the outcome remained the same regardless, and it was unclear which would definitively apply because of the manner of transfer of the case from Illinois federal court) to assess whether California's anti-SLAPP law would apply to unfair competition counterclaims (which could have been brought under California, Illinois or Connecticut law) and abuse of process counterclaims (which the court concluded could not be maintained under either state or federal law). *See id.* at 1125, 1151, 1155-59. In that case, in the course of assessing Illinois's choice of law principles, the court employed "depecage" – an Illinois principle the court described as "identify[ing] each issue raised in the case and then determin[ing] the controlling law on an issue-by-issue basis," *id.* at 1158 – to conclude that California did *not* have a significant interest in having its anti-SLAPP law applied because the speakers in question had little relationship to California, were not "California speakers," and the speech in question occurred in a proceeding in the District of Columbia. *Id.* The court likewise concluded that California's anti-SLAPP law would not apply using California's choice of law rules because the parties were not California residents, and the tortious conduct and injury did not occur in California. *See id.* at 1159.

In *Schering Corp.*, the federal district court applied New Jersey choice-of-law

rules – the District of New Jersey had transferred the action to the Northern District of California pursuant to 28 U.S.C. § 1404(a) – and, in so doing, determined that a choice-of-law determination would be necessary "on an issue-by-issue basis."  2007 U.S. Dist. LEXIS 50164, at *8-10.[13]  Thus, the court looked to whether California and New Jersey both had anti-SLAPP statutes.  *See id.* at *10.  Under the Restatement (Second) Conflict of Laws – upon which New Jersey relies heavily in conducting the necessary analysis – the *Schering* court noted that for "multistate defamation" cases "the state of most significant relationship will usually be the state where the [defamed] corporation, or other legal person, had its principal place of business at the time, if the matter complained of was published in that state."  *Id.* at *11, 13.  Further, in analyzing the factor of the "states' competing interests and interstate comity," the *Schering* court ultimately concluded that "[t]he California anti-SLAPP statute should apply only to 'wholly domestic concerns' and not the 'multi-state situation.'"  *Id.* at *18 (quoting *Fu v. Fu*, 733 A.2d 1133, 1142 (1999)).

Thus, as is the case with California choice of law analysis generally, both *Competitive Technologies* and *Schering* assessed choice of law on an issue-by-issue basis.  Both would clearly support the view that California's anti-SLAPP statute would not apply *at least* with respect to Plaintiffs' two Illinois statutory claims, whether because 1) the speech at issue and the parties to this case have little connection to California[14] (or at least little connection to California *in particular*[15]), 2) Illinois would be the "state of most significant relationship," and/or 3) this case does not consist of a "wholly domestic

---

[13] Plaintiffs' only citation to support the contention that California's anti-SLAPP law would not apply to the two Illinois statutory claims is to *Schering*.

[14] Plaintiffs allege that eDrop-Off "regularly transacts business nationwide and, particularly, in Los Angeles, California through its website www.shopedropoff.com."  FAC ¶ 4.  However, as noted *supra*, eDrop-Off is an Illinois limited liability company and McFadden is a resident and citizen of Illinois.  *See id.*  Without some better indication of what it means for "an online luxury apparel boutique" to "particularly" – through its website – transact business in Los Angeles, the Court has little reason to conclude that there is a substantial connection between Plaintiffs and California.

[15] Certainly it appears to be true both that 1) the right to free speech protects, *to some extent*, listeners/ readers as well, *see Gerawan Farming, Inc. v. Lyons*, 24 Cal.4th 468, 485 (2000); *Huntley v. Pub. Utils. Comm'n*, 69 Cal.2d 67, 72 (1968); *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1998), and 2) the distribution of this speech over the Internet obviously extends to California listeners.  But California is not the only state in the union (or the United States the only country in the world) with access to the Internet.  It, therefore, has no *particular* interest in this case.

concern," but is instead a "multi-state" case.[16]

The California Court of Appeal has ruled that at least certain conduct occurring in foreign *countries* is not conduct that is subject to California's anti-SLAPP statute, because it does not involve conduct protected by the United States or California Constitutions. *See Guessous v. Chrome Hearts, LLC*, 179 Cal.App.4th 1177, 1185-87 (2009) (concerning the filing of lawsuits in France). *But see Summerfield v. Randolph*, 201 Cal.App.4th 127, 137 (2011) (holding that filing in foreign court in order to influence determination of issues pending in California court *is* subject to anti-SLAPP). This manner of analysis, while it does recognize *some* territorial limits on the anti-SLAPP statute's application, might suggest that *Competitive Technologies* and *Schering* have taken their analysis too far in determining that California's anti-SLAPP statute does not apply simply because the underlying conduct was "multi-state" or occurred outside California. Of course, *Guessous* involved only breach of contract and declaratory relief claims, both presumably brought under California law. *See Guessous*, 179 Cal.App.4th at 1182. *Summerfield* likewise involved a malicious prosecution claim under California law. *See Summerfield*, 201 Cal.App.4th at 137.

In the end, whether viewed as the Court 1) determining that a choice of law analysis would be entirely inappropriate here because of Plaintiffs' selection of Illinois statutes for its two state statutory claims, 2) deciding that a choice of law analysis would be appropriate but for the fact that the anti-SLAPP statute is a *procedural* statute, yet still concluding that *Competitive Technologies* and *Schering Corp.* reached the right conclusion as to application of California's anti-SLAPP statute on these facts, or 3) deciding that a choice of law analysis would be appropriate, and that the anti-SLAPP statute is *substantive*, yet nevertheless concluding at the third step of the "governmental interests" analysis that Illinois's interests would be more impaired (because of that jurisdiction's ties to Plaintiffs), the outcome here is the same – the Court will not apply California's anti-SLAPP statute to Plaintiffs' second and third claims. Although the

---

[16] *Global Relief v. N.Y. Times Co.*, No. 01 C 8821, 2002 U.S. Dist. LEXIS 17081 (N.D. Ill. Sept. 11, 2002), would not aid Midley on this question because, in that case, the Northern District of Illinois – also applying depecage – merely assumed California's anti-SLAPP statute would be applicable for sake of argument (because it did not change the outcome) where the speakers in question were "California speakers" – a California corporation (publisher of the San Francisco Chronicle) – and two of its employees. *See id.* at *31-36.

Second Circuit's decision in *Liberty Synergistics* could conceivably have some impact on the foregoing analysis, for reasons that are addressed *infra* the Court does not believe that it would, in the end, change the analysis insofar as Plaintiffs' two Illinois statutory claims are concerned.

      C.  <u>Common Law Claims</u>

      Whatever the Court might conclude about application of California's anti-SLAPP statute to Plaintiffs' Illinois statutory claims, Plaintiffs' only argument for why California law (including California's anti-SLAPP statute) should not apply to the seven state common law claims is based upon its assertion that choice of law principles would dictate that Illinois law would apply. Unlike their two state law statutory claims, Plaintiffs' common law claims (with one exception[17]) are not specifically tied to the common law of any particular jurisdiction. As such, for purposes of determining which *substantive* law applies to those claims, the Court would, again, likely be justified in applying California law as the default. *See Deutsch*, 324 F.3d at 716.

      One major difficulty with Plaintiffs' attempt to have Illinois substantive law apply to their common law claims is that they have not satisfied their burden, as the proponent of the application of a foreign law, to demonstrate an actual conflict between *substantive* California and Illinois law with respect to any of these seven claims.[18] *See Wash. Mut. Bank, FA v. Superior Court (Briseno)*, 24 Cal.4th 906, 919 (2001) ("Under the first step of the governmental interest approach, the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California."); *see also Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d 1135, 1138 (9th Cir. 2003) ("When neither party identifies a meaningful conflict between California law and the law of another state, California courts apply California law."); *Vaughn v. LJ Int'l, Inc.*, 174 Cal.App.4th 213, 227 (2009) ("The defense argued that Delaware law regarding a prefiling demand requirement should apply pursuant to the internal affairs doctrine, but made no showing of a difference between

---

[17] In fact, Plaintiffs' seventh cause of action, for intentional interference with prospective economic advantage, would appear to be explicitly based upon California law. *See* FAC ¶ 93.

[18] Indeed, to the extent Plaintiffs have made an effort to compare the two states' substantive laws, they have argued that false accusations of a crime constitute *per se* defamation and trade libel under *both* Illinois and California law.

California and Delaware law.  The court's decision to apply California law was therefore based on the lack of a showing of a true conflict of law rather than rejection of the internal affairs doctrine.") (omitting internal citation) (discussing *Shields v. Singleton*, 15 Cal.App.4th 1611, 1621 (1993)).  As such, generally speaking, the Court would be inclined to apply California law with respect to the substance of Plaintiffs' common law claims.

Nevertheless, insofar as the Court is ordinarily tasked with undertaking a choice of law analysis for each issue in the case (as discussed further above), the Court still might have to consider whether there would be a "conflict" between California's and Illinois's *anti-SLAPP laws* with respect to Plaintiffs' common law claims.  As Plaintiffs noted, given that the Court has already concluded, in the context of voluntary-dismissal related proceedings, that Illinois's statute would not (or likely would not) apply, *see* Docket Nos. 36, 42-1, there is likely such a conflict here.  As such, the analysis would then ordinarily turn to considerations of comparative impairment of California's and Illinois's interests.

Here is where the Court believes the Second Circuit's recent *Liberty Synergistics* decision persuasively demonstrates that this Court need not in fact proceed down that path.  Instead, it can conclude that, at least for Plaintiffs' common law claims, there is no prospect that anything other than California's anti-SLAPP statute would apply to the common law claims.

In *Liberty Synergistics*, the Second Circuit confronted a case which began in California state court, was removed to a California federal court, and then voluntarily transferred to the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1404(a).   *Liberty Synergistics*, 718 F.3d at 142, 144. Substantively, the case involved an allegation of "malicious prosecution with respect to prior litigation in federal court in New York."  *Id.* at 142.  The defendants originally filed an anti-SLAPP motion while the case was still in federal court in California, but the transfer to New York occurred before the California federal court decided the motion. *See id.* at 143-44.  Once transferred to the federal court in New York, that court denied a re-filed (again under California law) anti-SLAPP motion based on its conclusion that "because New York law, not California law, governs the substance of the plaintiff's

cause of action, and because the suit was transferred to a federal court in New York, California's anti-SLAPP rule did not apply."  *Id.* at 142, 144.

For purposes of this case – and notwithstanding the fact that this case does not involve section 1404(a) considerations – the key take-away from *Liberty Synergistics* is the conclusion that, whatever the result might be under California's choice of law rules (which applied in that case because of the transfer to New York by way of section 1404(a), *see id.* at 153-54) with respect to the determination of which state's *substantive* law would apply to the malicious prosecution claim, California's anti-SLAPP statute would be applied *wherever* the case went forth.  *See id.* at 144, 154, 157.  "*We have no reason to doubt* that a California state court would apply California's anti-SLAPP rule as a matter of its own procedural rules, even if it applied New York substantive law to the merits of the malicious prosecution action."  *Id.* at 154 (emphasis added).  "Indeed, California courts have repeatedly held, as a matter of state law, that California's anti-SLAPP rule is 'procedural' in nature and therefore applies in California courts regardless of which source of law governs a plaintiff's claim."  *Id.* (citing two California cases where plaintiffs had based claims on *federal* statutes).  In other words, the Second Circuit effectively reached the conclusion that no choice of law analysis was even necessary with respect to the anti-SLAPP question.[19]

*Liberty Synergistics*, then, fully supports the view, expressed *supra*, that a conflict/choice of law analysis in connection with anti-SLAPP statutes is truly a square peg-round hole situation; in other words, that outside of *Erie*-based considerations, the statutes are *procedural* devices that are not designed to undergo such analysis.[20]  Of

---

[19] It is true that the Second Circuit continued on to support its conclusion by way of both "belt *and* suspenders" by reasoning that California's anti-SLAPP statute would apply *even if* a "'substantive' choice-of-law analysis using California's 'governmental interest analysis' approach" was required.  *See Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 155 (2d Cir. 2013).  However, this is plainly only an alternative basis for the court's conclusion, as made clear by the immediately-following comment that "[i]t is unclear to us that this type of conflicts analysis was even necessary under California law, given the procedural nature of the anti-SLAPP rule…."  *Id.*  Moreover, the Second Circuit's alternative reasoning in this regard was founded only upon an *unpublished* California appellate decision.  *See id.* (quoting and citing *McDaniel v. McDaniel*, No. B226832, 2011 WL 4940687, *7-8 (Cal. Ct. App. Oct. 18, 2011)).

[20] The Court fully recognizes that several courts – obviously including *Competitive Technologies* and *Schering* – have indeed attempted anti-SLAPP-related choice of law analyses.  *See also Chi v. Loyola Univ. Med. Ctr.*, 787 F.Supp.2d 797, 803 (N.D. Ill. 2011); *Dawe v. Corrections USA*, No. CIV. S-07-1790 LKK/EFB, 2009 U.S. Dist. LEXIS 45205, *18-19, 23-25 (E.D. Cal. May 20, 2009); *Containment Techs. Grp. v. Am. Soc'y of Health Sys. Pharmacists*, No. 1:07-cv-0997-DFH-TAB, 2009 U.S. Dist. LEXIS

course, this then presents the possibility of bringing the question back full-circle to Plaintiffs' Illinois statutory claims – if a California court, state or federal, should apply California's anti-SLAPP statute (at least in a situation where a section 1404(a) transfer has not occurred) regardless of the substantive law giving rise to the claims in the case, then why would the Court hold to its view that the Illinois statutory claims should not be assessed likewise?[21]  *See id.*  ("The text of [California's anti-SLAPP] rule is not limited to causes of action that arise under California law, and we perceive no reason to construe it that way.").  Simply put, *Liberty Synergistics*, no matter how persuasive the Court feels that decision is for cases like it, did not deal with a situation where, at least in part, a plaintiff specifically elected to assert claims under a foreign state's statute (and that election makes sense considering the connections of the case to that foreign state).  In that

---

25421, *16-21 (S.D. Ind. Mar. 26, 2009) (analyzing choice of law *without* depecage doctrine in play); *Sharif v. Sharif*, No. 10-10223, 2010 U.S. Dist. LEXIS 86853, *9-12 (E.D. Mich. Aug. 24, 2010).  Apart from the support *Competitive Technologies* and *Schering* lend to the Court's conclusion that California's anti-SLAPP statute could *not* apply to Plaintiffs' two Illinois statutory claims, however, the Court finds *Liberty Synergistics* most persuasive on this question.  It is, to this Court's knowledge, the only federal appellate court to have ever considered this precise question (although, again, not in the context of claims explicitly brought under some foreign state's statute(s) – a limitation that is equally true of *Chi*, *Dawe*, *Containment Technologies* and *Sharif*).

[21] The opposite question is equally predictable, especially if the Court were to ignore or disagree with *Liberty Synergistics* – if California's anti-SLAPP statute should *not* be applied to Plaintiffs' Illinois statutory claims, why *should* it be applied to the common law claims?  Indeed, neither *Competitive Technologies* nor *Schering Corp.* involved state statutory claims.  *See Competitive Technologies*, 286 F.Supp.2d at 1125-27; *Schering Corp.*, 2007 U.S. Dist. LEXIS 50164, *5.  Like those cases, whether statute- or common law-based, the allegations here still concern events that had minimal connections to California, unless the Court is to reach the conclusion that virtually anything that happens on the Internet is sufficiently tied to California because at least one person in California has a computer and can read.  Yet, *Competitive Technologies* was first filed in Illinois, *see* 286 F.Supp.2d at 1124, and *Schering Corp.* was first filed in New Jersey, whereas this case was first filed here, in California.  Assuming *Liberty Synergistics*' approach is inapplicable (or found unpersuasive), where a plaintiff voluntarily elects a California forum *while raising general common law claims*, California's general interest in "safeguard[ing] the free flow of information," *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F.Supp.2d 799, 822 (N.D. Cal. Mar. 27, 2011) (citing, among other things, Cal. Code Civ. Proc. § 425.16 *et seq.*), might then be seen as overriding the fact that this lawsuit has, in the end, little particular connection to this forum.  *See also Schroeder v. Irvine City Council*, 97 Cal.App.4th 174, 196 (2002) ("There is a substantial governmental interest in deterring unmeritorious lawsuits generally, and that interest assumes greater weight in the arena governed by section 425.16: unmeritorious lawsuits that can chill the defendant's exercise of First Amendment rights.").  It is for this additional reason that the Court concludes California's anti-SLAPP statute would apply to the common law claims Plaintiffs have advanced in the FAC.

situation, this Court is not convinced that outright declining to perform some form of conflict/choice of law analysis in favor of an automatic selection of the home forum's/jurisdiction's anti-SLAPP statute is the correct approach. *See id.* at 155 ("To be sure, the Due Process Clause and the Full Faith and Credit Clause, among other constitutional provisions, provide *some* limitations to the application of state conflict-of-law rules in ways that would frustrate causes of action defined by other states' laws, but this case does not approach those constitutional boundaries."). Once the Court concludes such an assessment is necessary, it believes – for the reasons addressed *supra* – that Illinois has a far-greater interest in this case than does California, and that applying California's law instead of Illinois's would impair interests more significantly than the converse.

### 1. Anti-SLAPP Analysis of the Common Law Claims

Once a decision is made to apply California's anti-SLAPP laws to Plaintiffs' common law claims, the analytical process underlying that task is, by now, a relatively well-tread path in most respects. Section 425.16 is designed to prevent "cause[s] of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech." Cal. Code Civ. Proc. § 425.16(b)(1). "To prevail on an anti-SLAPP motion, the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013); *see also Zamani v. Carnes*, 491 F.3d 990, 994 (9th Cir. 2007); *Equilon Enters., LLC v. Consumer Cause, Inc.*, 29 Cal.4th 53, 67 (2002).[22] "The burden then shifts to the plaintiff…to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal." *Makaeff*, 715 F.3d at 261; *see also Equilon Enters.*, 29 Cal.4th at 67.

### a) Step One – Acts in Furtherance of Free Speech Rights

To satisfy its burden at the first step, a defendant demonstrates "that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)…." *City of Cotati v. Cashman*, 29 Cal.4th 69, 78 (2002) (quotation marks omitted). To fall within the potentially protective sphere of California's anti-SLAPP

---

[22] However, "[t]he defendant bringing a motion to strike 'need not show that the plaintiff's suit was brought with the intention to chill the defendant's speech' or 'that any speech was actually chilled.'" *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010).

statute, the conduct in question must have been "an act in furtherance of…free speech…in connection with a public issue," and include:

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Code Civ. Proc. § 425.16(e).   "The statute is to be 'construed broadly.'" *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010) (quoting Cal. Code Civ. Proc. § 425.16(a)).

"The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability – and whether that activity constitutes protected speech or petitioning." *Navellier v. Sletten*, 29 Cal.4th 82, 92 (2002).  But the anti-SLAPP statute is targeted at causes of action, not "particular allegations within a cause of action."  *See A.F. Brown Elec. Contractor, Inc. v. Rhino Elec. Supply, Inc.*, 137 Cal.App.4th 1118, 1124 (2006). The critical question is whether the causes of action themselves were *based on* an act or acts in furtherance of the right of petition or free speech.  *See Mindys Cosmetics*, 611 F.3d at 597; *City of Cotati*, 29 Cal.4th at 78.  A cause of action alleging both protected and unprotected activity will be subject to section 425.16 unless the protected conduct is "'merely incidental' to the unprotected conduct."  *Scott v. Metabolife Int'l, Inc.*, 115 Cal.App.4th 404, 414, 419 (2004); *see also Thomas v. Quintero*, 126 Cal.App.4th 635, 653 (2005) ("A cause of action is subject to a motion to strike under the anti-SLAPP statute even if it is based only in part on allegations regarding protected activity."); *Martinez v. Metabolife Int'l, Inc.*, 113 Cal.App.4th 181, 187-88 (2003) ("[I]t is the principal thrust or gravamen of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies, and when the allegations referring to arguably protected

activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute.").

Plaintiffs do not actually appear to contest Midley's ability to satisfy the first step of the anti-SLAPP analysis.  If indeed they have conceded the point, the concession is very likely well-thought-out.  In *Makaeff*, the Ninth Circuit recently concluded that statements published on the Internet "to alert other consumers of…opinions and experience" with a particular business and its allegedly questionable practices satisfied the "act in furtherance of free speech rights" requirement, specifically as "conduct in connection 'with a public issue or an issue of public interest.'"  *See Makaeff*, 715 F.3d at 261-63; *see also Wilbanks v. Wolk*, 121 Cal.App.4th 883, 899-900 (2004).

In the very first numbered paragraph of the FAC, Plaintiffs describe the "nature of the action" as Midley "solicit[ing] and shap[ing] false and disparaging attacks on Plaintiffs, including false allegations that Plaintiffs engaged in criminal conduct known as shill-bidding," described further as "the criminal practice of intentionally bidding on products to heighten the bidding price," and then in bad faith deleting Plaintiffs' (and others') attempts to defend Plaintiffs by way of posting explanations on the same website.  FAC ¶¶ 1, 11; *see also id.* ¶¶ 24, 26-27.  Elsewhere, Plaintiffs have described Midley's practices as "intentional[ly] and purposeful[ly]…denigrating and defaming legitimate business owners" by way of "post[ing], publish[ing] and/or encourag[ing] the posting of defamatory and anti-competitive content against legitimate businesses."  *Id.* ¶ 14; *see also id.* ¶¶ 17, 19-20 (describing "defamatory comments and attacks on Plaintiffs," first published through two separate comment threads posted by one of Midley's users); *id.* ¶ 28 (alleging that the aforementioned user and/or Midley's agents "also advise consumers that they 'probably don't want to do business with edropoff', repeatedly dubs eDrop-Off 'eripoff', accuses Plaintiffs of 'illegal' activity and encourages consumers to report them to VH1, claims that eDrop-Off is 'cheating his/her buyers', and generally facilitates (through PurseBlog) a defamatory viral discourse"); *id.* ¶ 30 ("Defendant actively worked in concert with BeenBurned to post, encourage and solicit wrongful and baseless false and disparaging remarks and accusations of illegal and unethical conduct, as well as calls that Plaintiffs be criminally investigated by, inter alia, the United States Attorney in

Illinois and other governmental entities with the purpose of destroying Plaintiffs' brand and reputation, and driving business to its own website."); *id.* ¶ 32 (alleging that Midley's owner "add[ed] comments to stoke the fires in the defamatory threads"); *id.* ¶ 40 (alleging that Midley "became the owner of the speech it encouraged and rewarded").

By these and other allegations, Plaintiffs have effectively admitted the public nature of the conduct in question. *See also id.* ¶ 29 ("The Terms of Use for Purseblog's website prohibit the very *public* attacks that PurseBlog has encouraged, solicited, and rewarded here against Plaintiffs.") (emphasis added); *id.* ¶ 45 (referencing "the reader traffic and potential for ad revenue previously generated by the inordinate interest in the First Defamatory Thread"); *id.* ¶ 47 ("Ultimately, Plaintiffs allege that the First Defamatory Thread and Second Defamatory Thread have spawned a widespread outcry against them, which is evidenced by over 1,000 (and counting) responsive comments on PurseBlog's website disparaging Plaintiffs and attacking their credibility…."). In response to the accusations posted on Midley's website, a number of Plaintiffs' existing clients have allegedly sought refunds or decided to terminate their client relationship with eDrop-Off, and a number of prospective clients have determined and declared that they will never do business with Plaintiffs. *See id.* ¶¶ 36-37. Most of, if not all of,[23] the common law claims the Court has determined are subject to a motion under California's anti-SLAPP law are based on the foregoing allegations. *See id.* ¶¶ 69-71, 76, 78, 84, 86, 89-91, 112-14.

  b) "Commercial Speech"

Instead of challenging Midley's ability to satisfy the first prong of the normal anti-SLAPP analysis, however, Plaintiffs assert that the "commercial speech" exception to application of California's anti-SLAPP analysis resonates here. Section 425.17(c) of

---

[23] Plaintiffs' breach of contract and promissory estoppel claims are based at least in part on the same free speech-based conduct. *See* FAC ¶¶ 101, 103, 108-09. They are also in part based, however, on Midley's alleged failure to abide by the "Forum Rules" provision for recourse forum members are supposed to have when they have a concern or complaint about others' posts. *See id.* ¶¶ 102, 109. Although there might have been room for a "merely incidental" or "gravamen"-based argument as to these two claims, *see, e.g.*, *Scott v. Metabolife Int'l, Inc.*, 115 Cal.App.4th 404, 414, 419 (2004), Plaintiffs did not make such an argument. Nor did Plaintiffs limit their breach of contract and promissory estoppel claims so as to exclude reference to the free speech-related activity occurring on Purseblog in order to take advantage of a Ninth Circuit decision that might have rewarded them for such a limitation. *Cf. Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009) ("In a promissory estoppel case, as in any other contract case, the duty the defendant allegedly violated springs from a contract – an enforceable promise – not from any non-contractual conduct or capacity of the defendant.").

California's Code of Civil Procedure provides, in pertinent part, as follows:

> (c) Section 425.16 does not apply to any cause of action brought against a person *primarily engaged in the business of selling or leasing goods or services*,…arising from any statement or conduct by that person if both of the following conditions exist:
>
> (1) The statement or conduct consists of representations of fact about that person's or *a business competitor's* business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services.
>
> (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation,…notwithstanding that the conduct or statement concerns an important public issue.

Cal. Code Civ. Proc. § 425.17(c) (emphasis added).  Plaintiffs have the burden of demonstrating section 425.17(c)'s application.  *See Hawran v. Hixson*, 209 Cal.App.4th 256, 273 (2012) ("The plain language of section 425.17 requires that a plaintiff establish all of the elements of the section 425.17 exemption."); *Rivera v. First DataBank, Inc.*, 187 Cal.App.4th 709, 717 (2010).  *But see DCI Solutions, Inc. v. Urban Outfitters, Inc.*, No. 10-CV-369-IEG (JMA), 2010 U.S. Dist. LEXIS 44438, *12 (S.D. Cal. May 6, 2010) ("[T]he party moving to strike under the antiSLAPP [*sic*] statute bears the burden of establishing that the exception does not apply.").

In *Hilton*, the Ninth Circuit took a very restricted view of what would amount to commercial speech under section 425.17(c).  There, the court stated that "[t]he core notion of commercial speech is that it does no more than propose a commercial transaction… [U]nder this definition, commercial speech is best understood as speech that merely advertises a product or service for business purposes."  599 F.3d at 905 n.7 (omitting internal quotation marks).  Plaintiffs would plainly fail to satisfy their burden under section 425.17(c) if the Court looked only to *Hilton*'s construction of the concept.

Two months after the Ninth Circuit issued its amended opinion in *Hilton* (which contained the above language), in *Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal.4th 12 (2010), the California Supreme Court confirmed that the commercial speech exemption should be "narrowly construed."   *Id.* at 22; *see also Rivera*, 187 Cal.App.4th at 717 ("[S]ection 425.17 is to be narrowly construed.").   *Simpson Strong-Tie* distilled the statute into the following requirements for its application:

> (1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services; (2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services; (3) the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and (4) the intended audience for the statement or conduct meets the definition set forth in section 425.17(c)(2).

*Simpson Strong-Tie*, 49 Cal.4th at 30.   Plaintiffs' attempt to make use of the section 425.17(c) exception falls short with respect to (at least) one of these elements.

Plaintiffs describe eDrop-Off as "an online luxury apparel boutique which has received accolades for effectuating record auctions on eBay for consignment of luxury items, which [*sic*] transacts all of its sales through auctions on its own website and on eBay." FAC ¶ 4; *see also id.* ¶¶ 8-12[24]; *id.* ¶ 112 (referencing "Plaintiffs' business, brand and reputation in the global consignment market").   Midley, on the other hand, is described as operating PurseBlog, "an editorial website and discussion forum about designer bags."   *Id.* ¶ 5; *see also id.* ¶ 14; *id.* ¶ 78 (referring to www.purseblog.com as "a widely disseminated and reviewed online discussion forum").

Without specifically identifying which part of the section 425.17(c) analysis it challenges, Midley emphasizes that Plaintiffs have not established, much less alleged, that Midley itself sells any sort of goods.[25]   Instead, Midley emphasizes, the FAC alleges

---

[24] The FAC skips from paragraph 9 to paragraph 12, such that a citation to paragraphs 8-12 actually encompasses only three paragraphs.

[25] Because of the focus in its argument on the absence of sales of *goods* in its operation, the Court conceivably could interpret the argument as focusing upon the question of whether Midley and Plaintiffs were/are competitors.  Yet, as the following footnote discusses in more detail, the Court might question

– and Plaintiffs have attempted to evidence – only that Midley's *users* sell goods by way of the website.[26]  Whereas "BeenBurned" might be seen as one of Plaintiffs' "business competitors," *see id.* ¶ 17 (describing "user Nancy R. Burke a/k/a BeenBurned" as "a competitor of Plaintiffs in the sale of merchandise online"),[27] Plaintiffs have offered nothing more than conclusory assertions that Midley is as well (whether by way of an agency relationship with BeenBurned or otherwise).  *See, e.g.*, FAC ¶ 1 (referencing Midley's "competitive tactics"); *id.* (describing Plaintiffs as "Defendant's competitor in the online sale of handbags and luxury apparel"); *id.* ¶ 14 ("Plaintiffs are informed and believe that there are numerous business competitors, whose legitimate businesses have been maligned by Defendant and PurseBlog users, such as BeenBurned, working in concert and separately to post, publish and/or encourage the posting of defamatory and anti-competitive content against legitimate businesses."); *id.* ¶ 27 (alleging that "BeenBurned is part of an intimate control group of PurseBlog, with special privileges to…be remunerated for her commentary – such as the incendiary and defamatory content at issue – about legitimate businesses by being given the ability (by PurseBlog) to sell her

---

whether Plaintiffs could establish that Midley was even primarily engaged in the selling of *services*.  If it was not primarily engaged in the sale of either goods *or* services, the Court has no need to proceed to the competition question/element.  *See* Cal. Code Civ. Proc. § 425.17(c); *Simpson Strong-Tie*, 49 Cal.4th 12, 30 (2010).

[26] Whether or not Midley is one of Plaintiffs' competitors, the Court would also question whether Midley is "primarily engaged in the business of selling or leasing goods or services," another of the exception's requirements.  Cal. Code Civ. Proc. § 425.17(c); *Simpson Strong-Tie*, 49 Cal.4th at 30; *see also* FAC ¶ 14 (alleging, on information and belief, that Midley "is driving traffic to its website through an intentional and purposeful practice of denigrating and defaming legitimate business owners in order to drive eyeballs and ad revenue"); *id.* ¶ 15 (referencing fact that PurseBlog "has become one of the Top 40 busiest online forum communities worldwide" and that Midley's "goal of generating ad revenue has been realized").  Indeed, Plaintiffs themselves are registered members of PurseBlog, *see* FAC ¶ 98, but there is no suggestion that they accessed PurseBlog *to buy or sell handbags*.  *See id.* ¶¶ 98-99 (referencing signing of online contract, titled the "Forum Rules," and "Plaintiffs' participation on the forum"); *id.* ¶ 103 ("[A]ll users who register for membership on www.purseblog.com, including BeenBurned, must first enter into the same online contract with Defendant and, therefore, expressly agree not to attack other members on the website."); *id.* ¶¶ 106, 109-10.  At this stage, it does not appear that Midley contests this element of the section 425.17(c)/*Simpson Strong Tie* test, but if the Court were to conclude that there was sufficient reason for holding off on ruling on the section 425.17(c) exception – as explained above, it does not, at least on the papers – it would instruct the parties to direct their attention to whether the nature of Midley's business satisfies that element and, if so, why.  *Cf. Contemporary Servs. Corp. v. Staff Pro Inc.*, 152 Cal.App.4th 1043, 1053-54 (2007); *New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d 1090, 1103-04 (C.D. Cal. 2004).

[27] *See also* FAC ¶ 23 ("Plaintiffs are informed and believe, and thereon allege, that BeenBurned is a direct business competitor of eDrop-Off as a reseller of purses (known as 'thebargainprincess') of luxury apparel on Bonanza.com.").

own products in a coveted, invitation-only, location on PurseBlog called the 'Marketplaza.'"); *id.* ("[O]n information and belief, Defendant's website facilitates, promotes and participates in the consignment and/or auction of high-end luxury handbags and, therefore, Defendant and Plaintiffs are direct business competitors."); *id.* ¶ 30 ("Defendant actively worked in concert with BeenBurned to post, encourage and solicit wrongful and baseless false and disparaging remarks and accusations of illegal and unethical conduct, as well as calls that Plaintiffs be criminally investigated…with the purpose of destroying Plaintiffs' brand and reputation, and driving business to its own website."); *id.* ¶ 46 ("All of Defendant's and BeenBurned's False Statements constituted commercial speech made for the purpose of driving revenue for PurseBlog through increasing traffic on its website, sales through MarketPlaza, and the related advertising revenue, and for BeenBurned by seeking to discredit her competitor in the eBay handbag market through false attacks on Plaintiffs [*sic*] business practices."); *id.* ¶ 49 (referencing "anti-competitive statements").  Even if Midley is in the "business" of providing an Internet advertising vehicle, that is plainly not the nature of Plaintiffs' own business.  No matter what the Court might conclude about the relationship between Burke/BeenBurned and Plaintiffs, *Midley* and Plaintiffs simply are not "business competitor[s]."  *Cf. All One God Faith, Inc. v. Organic & Sustainable Indus. Standards, Inc.*, 183 Cal.App.4th 1186, 1213-14 (2010) (rejecting reading of "primarily engaged" language that would apply to "someone acting on behalf of" a person primarily engaged in the business of selling or leasing goods or services).

Plaintiffs believe they must have an opportunity to conduct discovery before the section 425.17(c) issue is resolved, because they believe they can establish Midley's status as one of their competitors.  They believe that Midley is one of their competitors because it hosts a website *and* purportedly sells purses.  Again, they have offered nothing more than conclusory speculation at this time.  *See Rivera*, 187 Cal.App.4th at 718 ("[P]laintiffs presented no evidence to support [their commercial speech] claim and a mere allegation does not suffice.").  Even if the Court is limited to reviewing the assertion under Rule 12(b)(6)-like standards – because to assess it using evidentiary standards would first require the opportunity to conduct discovery, under *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d at, 845-46 – such allegations plainly would not surpass

review under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiffs have offered the Court no reason to believe that they could amend further in this regard, adding additional *facts*, and, under *Twombly*, a plaintiff does not get to "jump the queue" to discovery when it is unable to *factually* plead a plausible basis for a claim or defense that would lead to discovery.

Moreover, repeated opportunities to amend (as might be the case in a normal Rule 12(b)(6) setting) at some point in time gets so far afield from the normal operation of an anti-SLAPP motion that the anti-SLAPP motion is, in essence, transformed into a Rule 12(b)(6) motion (albeit with a potentially ever-increasing pot of attorney fee gold at the end of the procedural rainbow).  The Ninth Circuit was not faced with such repeated amendment opportunities in *Verizon*, 377 F.3d at 1091, and this Court harbors significant doubt that it would find the same conflict between California's anti-SLAPP statute and Rule 15 were it presented with such a scenario.

In short, section 425.17(c) does not apply here, Plaintiffs may not amend to cure their deficient attempt to allege facts showing that it does, and Midley may take advantage of section 425.16's anti-SLAPP procedure.

c)   <u>Step Two – Reasonable Probability of Prevailing</u>

Once the analysis passes the hurdle posed by Plaintiffs' invocation of section 425.17(c), Plaintiffs have yet another burden to sustain – establishing a reasonable probability that they will prevail on their claims.  *See Makaeff*, 715 F.3d at 261; *see also Equilon Enters.*, 29 Cal.4th at 67.  Under the "reasonable probability" of prevailing standard applicable to the second step in California's anti-SLAPP analysis, "the claim should be dismissed if the plaintiff presents an insufficient legal basis for it, or if, on the basis of the facts shown by the plaintiff, 'no reasonable jury could find for the plaintiff.'" *Makaeff*, 715 F.3d at 261 (quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d at 840); *see also Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1163 (9th Cir. 2011) (indicating that "'probability is a low bar," requiring that a plaintiff "demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited"); *Price*

*v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010).[28]

"Even if a plaintiff makes a prima facie evidentiary showing in support of his or her claims based on protected activities, the claims may still be stricken if the defendant can establish a complete affirmative defense to the claims." *Dwight R. v. Christy B.*, 212 Cal.App.4th 697, 715 (2013). In that situation, "[i]n order to demonstrate a probability of prevailing on the merits of the claims, the plaintiff must present evidence that, if credited, is sufficient to overcome the defendant's affirmative defense." *Id.*[29]; *see also Flatley v. Mauro*, 39 Cal.4th 299, 323 (2006) ("The litigation privilege is also relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing."); *Traditional Cat Ass'n, Inc. v. Gilbreath*, 118 Cal.App.4th 392, 398-99 (2004); *Greater LA Agency on Deafness v. Cable News Network, Inc.*, 862 F.Supp.2d 1021, 1025 (N.D. Cal. 2012) ("The plaintiff also must present evidence to overcome any privilege or defense to the claim that has been raised.") (Beeler, Mag. J.). In this case, Midley's success on this anti-SLAPP motion hinges on whether or not it has a successful defense under section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230.

Here, as the Court has previously explained, were the Court to consider *evidence* in resolving this question, under prevailing Ninth Circuit precedent it would all but certainly have to offer Plaintiffs the opportunity to conduct discovery first. As such, the Court will turn instead to an assessment of Plaintiffs' "reasonable probability" of prevailing under a Rule 12(b)(6)-type standard. *See Lauter v. Anoufrieva*, 642 F.Supp.2d 1060, 1109 (C.D. Cal. 2009) ("If a defendant makes an anti-SLAPP motion based on the

---

[28] In truth, there are numerous available descriptions of the burden at the second step of the typical anti-SLAPP analysis. *See Mindys Cosmetics*, 611 F.3d at 598-99 (omitting internal citations) (indicating that "reasonable probability" requires "only a 'minimum level of legal sufficiency and triability'" and that the second step of the anti-SLAPP inquiry "is often called the 'minimal merit' prong," requiring a plaintiff only to "state and substantiate a legally sufficient claim"); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001) ("[A] defendant's anti-SLAPP motion should be granted when a plaintiff presents an insufficient legal basis for the claims or 'when no evidence of sufficient substantiality exists to support a judgment for the plaintiff.'"); *see also Keller v. Electronic Arts Inc. (In re NCAA Student Athlete Name & Likeness Licensing Litigation)*, No. 10-15387, 2013 U.S. App. LEXIS 15649, *11-12 (9th Cir. July 31, 2013).

[29] Though *Dwight R.* spoke in terms of evidence-based motions, there is no reason why the same affirmative defense-hurdle (though measured by allegations, as opposed to evidence) would not apply to affirmative defenses that are revealed on the face of a complaint, for purposes of a Rule 12(b)(6)-style anti-SLAPP analysis.

plaintiff's failure to submit evidence to substantiate its claims, the motion is treated as a motion for summary judgment, and discovery must be developed sufficiently to permit summary judgment under Rule 56 . . . . If an anti-SLAPP motion is based on legal deficiencies in the complaint, a federal court must determine the motion in a manner that complies with the standards set by Federal rules 8 and 12."); *Rogers v. Home Shopping Network, Inc.*, 57 F.Supp.2d 973, 982 (C.D.Cal.1999) (indicating that if an anti-SLAPP motion to strike is based on the legal deficiencies of the complaint, a federal court "must decide the motion in a manner that complies with the standards set by Federal Rules 8 and 12" – including taking all well-pleaded allegations as true and allowing leave to amend under appropriate circumstances); *cf. Roberts v. McAfee, Inc.*, 660 F.3d at 1163 (describing standard to be applied to evidence-based anti-SLAPP motion).

### d) CDA § 230

The principal decision in the Ninth Circuit[30] with respect to the meaning and application of section 230 of the CDA is the *en banc* decision in *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (*en banc*). "Section 230 of the CDA immunizes providers of interactive computer services against liability arising from content created by third parties: 'No provider…of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.'" *Id.* at 1162 (quoting 47 U.S.C. § 230(c)). Midley/PurseBlog admit that it is an "interactive computer service," which is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). "This grant of immunity applies only if the interactive computer service provider is not *also* an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content." *Fair Housing*, 521 F.3d at 1162 (quoting 47 U.S.C. § 230(f)(3)).

> A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself, or is

---

[30] In at least certain respects, Plaintiffs prefer the view of the Eastern District of Kentucky, in *Jones v. Dirty World Entertainment Recordings, LLC*, 2012 U.S. Dist. LEXIS 2525 (E.D. Ky. Jan. 10, 2012). Needless to say, it is the Ninth Circuit's *en banc* views that control this Court's decision.

> "responsible, in whole or in part" for creating or developing, the website is also a content provider.  Thus, a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content.

*Id.* at 1162-63.  Section 230's protection is not limited to defamation, but extends to any cause of action which "inherently requires the court to treat the defendant as the 'publisher' or 'speaker' of content provided by another."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-02, 1104-05 (9th Cir. 2009) (discussing reach of subsection 230(c)(1)'s protection).

Section 230's enactment was an attempt "to immunize the removal of user-generated content, not the creation of content."  *Fair Housing*, 521 F.3d at 1163.  In particular, it was legislation passed in response to a decision that found Prodigy liable because Prodigy had voluntarily deleted some messages, without deleting others that were defamatory.  *See id.* (discussing *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 N.Y. Misc. LEXIS 229 (N.Y. Sup. Ct. May 24, 1995)); *id.* at 1175 ("When Congress passed section 230 it didn't intend to prevent the enforcement of all laws online; rather, it sought to encourage interactive computer services that provide users neutral tools to post content online to police that content without fear that through their 'good samaritan…screening of offensive material' they would become liable for every single message posted by third parties on their website.") (omitting internal citation).  In fact, the Ninth Circuit at least suggested that this was section 230's *only* purpose.  *See id.* at 1163 n.12.  *But see Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1173-74 (9th Cir. 2009).

With that "backdrop" in mind, the *en banc* Ninth Circuit analyzed "three specific functions" the website in question undertook: 1) posing questions to prospective subscribers that they were to answer as part of registering for the service provided; 2) "develop[ing]" and displaying the subscribers' discriminatory housing preferences; and 3) displaying discriminatory statements in the "Additional Comments" section of users'/subscribers' profile pages.  *See Fair Housing*, 521 F.3d at 1164-65, 1173.

As to the first function, because the website "created the questions and choice of answers, and designed its website registration process around them," it was "undoubtedly" the "information content provider" as to the questions.  *Id.* at 1164.  Thus,

section 230 immunity did not apply.  It also did not apply to the website's *requirement* that subscribers answer the questions at issue as a condition of using the services because this had the alleged effect of "inducing third parties to express illegal preferences."  *See id.* at 1165.  These functions of the website were "entirely its doing," leaving them outside the scope of section 230 immunity.

With respect to the second function, the website required subscribers to specify, using a drop-down menu, certain information about the housing provided or sought (including whether the present or desired occupants are or should be, male or female, straight or gay, and whether children were present or acceptable).  *See id.*  This information, once selected by the subscriber, was displayed on his or her profile page. *See id.*  Although the subscribers were of course content providers, so was the website, because it "requir[ed] subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers."  *Id.* at 1166; *see also id.* at 1170 n.26.  The Ninth Circuit determined that it became "the developer, at least in part, of that information," within the meaning of section 230.  *Id.* at 1166; *see also id.* at 1169-70.  The lack of immunity in this regard extended to the search system and email notification system that the website used to, respectively, "steer users based on the preferences and personal characteristics that [the website] itself forces subscribers to disclose" and "direct[] emails to subscribers according to discriminatory criteria."  *Id.* at 1167; *see also id.* at 1170.

In contrasting the website in question with other, more generic, search engines, the Ninth Circuit noted that, while it is true "that the broadest sense of the term 'develop' could include the functions of an ordinary search engine – indeed, just about any function performed by a website," it concluded that "to read the term so broadly would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides."  *Id.* at 1167.  But it emphasized that even development "in part" falls outside the scope of immunity.  *See id.* at 1165-67.  Thus, it "interpret[ed] the term 'development' as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness."  *Id.* at 1167-68.

To give more context to its understanding of what it is to "develop" content under section 230, the *en banc* majority provided a few "examples" of what either does or does

not fit within that term.  Providing "*neutral* tools" – such as an "ordinary search engine" – which another individual may use for improper purposes does not qualify as development.  *See id.* at 1169; *see also id.* at 1174 n.37 ("Providing neutral tools for navigating websites is fully protected by CDA immunity, absent substantial affirmative conduct on the part of the website creator promoting the use of such tools for unlawful purposes."); *id.* at 1175 (indicating that "a generic text prompt with no direct encouragement to perform illegal searches or to publish illegal content" would be immune); *Barnes*, 570 F.3d at 1101 n.6.  Also, "[a] website operator who edits user-created content – such as by correcting spelling, removing obscenity or trimming for length – retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality."  *Fair Housing*, 521 F.3d at 1169.[31]  However, one who "edits in a manner that contributes to the alleged illegality – such as by removing the word 'not' from a user's message reading '[Name] did *not* steal the artwork' in order to transform an innocent message into a libelous one – is directly involved in the alleged illegality and thus not immune."  *Id.*  Yet, the court emphasized that "passive acquiescence" in the misconduct of users – "even if the users committed their misconduct using electronic tools of general applicability provided by the website operator" – would "likely" give rise to CDA immunity, because "there is no vicarious liability for the misconduct of…customers."  *Id.* at 1169 n.24.  In short, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."  *Id.* at 1170-71.

The *en banc* court also took the opportunity to "clarify" the reasoning underlying one of the Circuit's earlier decisions, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003).  In doing so, it gave "a more plausible rationale for that earlier decision's 'unquestionably correct result'":

> The allegedly libelous content there – the false implication that
> Carafano was unchaste – was created and developed entirely by the

---

[31] The *en banc* decision was thus consistent with the Ninth Circuit's earlier decision in *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003), which held "that an editor's minor changes to the spelling, grammar and length of third-party content do not strip him of section 230 immunity" because those changes did not "contribute[] to the libelousness of the message."  *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170 (9th Cir. 2008) (*en banc*).  However, the question in *Batzel* was left open for further development on remand as to whether the editor would be liable for "selecting the…email for inclusion" in the editor's newsletter.  *Id.*

> malevolent user, without prompting or help from the website operator. To be sure, the website provided neutral tools, which the anonymous dastard used to publish the libel, but the website did absolutely nothing to encourage the posting of defamatory content – indeed, the defamatory posting was contrary to the website's express policies. The claim against the website was, in effect, that it failed to review each user-created profile to ensure that it wasn't defamatory. That is precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230. With respect to the defamatory content, the website operator was merely a passive conduit and thus could not be held liable for failing to detect and remove it.

*Fair Housing*, 521 F.3d at 1171-72. The *en banc* court contrasted the defendant in *Carafano* – which had done "absolutely nothing to enhance the defamatory sting of the message, to encourage defamation or to make defamation easier" – with the case then before it, which involved a website which "both elicit[ed] the allegedly illegal content and ma[de] aggressive use of it in conducting its business." *Id.* at 1172. In other words, it did not "merely provide a framework." *Id.*

Finally, as to the third function, wherein the website, "[a]t the end of the registration process, on a separate page from the other registration steps," provides the subscriber "a blank text box, in which he can type as much or as little about himself as he wishes," the Ninth Circuit ruled that section 230 immunity applied. *Id.* at 1173-74. The website "publishe[d] these comments as written," without providing "any specific guidance" as to what the essay should contain or urging any particular input. *See id.* at 1173-74; *see also Universal Commc'n Sys. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007) (holding immunity applied where alleged defamatory comments were made without any prompting or encouragement, such that "there [was] not even a colorable argument that any misinformation was prompted by Lycos's registration process or its link structure"); *Green v. Am. Online*, 318 F.3d 465 (3d Cir. 2003) (holding immunity applied where defendant had not solicited, encouraged or been involved in harmful content, other than by way of providing chat rooms for general use); *Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) (same as *Green*); *Fair Housing*, 521 F.3d at 1172 n.33 (discussing out-of-Circuit cases). In other words, this content was "passively displayed," and there was no doubt that this information was "tendered…for publication online."

*Fair Housing*, 521 F.3d at 1174.

Even had the website performed "minor editing and selection" by way of "filtering for obscenity or 'spam,'" "the outcome would not change." *Id.* at 1173 n.36. Nor would the encouragement (in the form of a "simple, generic prompt") for subscribers "to provide *something*" be enough to make a website a "developer" under section 230. *See id.* at 1174.

The *en banc* majority began the closing portion of its analysis by observing that

> [w]ebsites are complicated enterprises, and there will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality. Such close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged – or at least tacitly assented to – the illegality of third parties. Where it is very clear that the website directly participates in developing the alleged illegality – as it is clear here with respect to [the defendant's] questions, answers and the resulting profile pages – immunity will be lost. But in cases of enhancement by implication or development by inference – such as with respect to the "'Additional Comments" here – section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles.

*Id.* at 1174-75. It felt that "[t]he message to website operators is clear: If you don't encourage illegal content, or design your website to require users to input illegal content, you will be immune." *Id.* at 1175.

e) <u>Application of Section 230 and *Fair Housing* to This Case</u>

The Court has scoured the FAC to discern whether any of the conduct Plaintiffs have attributed to Midley would survive, at least under a Rule 12(b)(6)-type challenge, a CDA section 230 defense. Plaintiffs have attributed conduct to Midley in numerous paragraphs in the FAC. *See* FAC ¶¶ 1, 11, 14-15, 17, 19-20, 24-32, 39-43, 45, 49, 69, 71, 76, 90, 101-03, 108-09, 113. Moreover, Plaintiffs incorporated their allegations in paragraphs 1-47,[32] specifically, into each of their claims for relief. *See id.* ¶¶ 48, 57, 63, 68, 77, 83, 88, 96, 105, 111, 116.

At the very least, the majority of Plaintiffs' allegations in this regard consist of the

---

[32] In what appears to be a typo, paragraph 68 of the FAC incorporates paragraphs 1-49, instead of paragraphs 1-47. *See* FAC ¶ 68.

simple repetition of conclusory buzzwords designed to invoke the specter of activity falling outside of section 230's protections as discussed in *Fair Housing*.  Over and over, Plaintiffs aver that Midley "solicited," "shaped," "encouraged," "facilitated," "incentivized," "rewarded," "fomented," "elicited," "featured" and "enabled" the activity of others.  *See id.* ¶¶ 1, 11, 14-17, 19-20, 26-27, 29-30, 32, 39-40, 45, 49, 76, 101.  Plaintiffs also frequently allege that Midley "hosted," "published," "posted," "tolerated" or "maintained" the offending comments.  *See id.* ¶¶ 11, 14-15, 19-20, 29-30, 31-32, 39-40, 90, 103, 113.  But if *Fair Housing* makes anything clear, at the very least it is that mere "hosting," "publication," "posting," "toleration" and/or "maintenance" of content provided by others falls squarely within section 230's protective cloak, even assuming that those verb-form allegations could not be dismissed as conclusory.  *See Fair Housing*, 521 F.3d at 1162-63, 1169 n.24, 1171-74.

Mere reliance on buzzwords, however, does not fully encapsulate Plaintiffs' allegations concerning Midley's actions.  Plaintiffs also allege that when they (and others) attempted to respond to the posts occurring on the comment threads in question in order to "correct" the message(s) being conveyed, Midley deleted those attempts.  *See* FAC ¶¶ 1, 14, 24-25, 31-32, 76, 102, 109.  The *Fair Housing* decision did not concern a comment thread/forum such as the one involved in this case.  But, by analogy, the Court does believe that it provides some guidance useful in resolving whether this type of conduct can lead to liability notwithstanding CDA section 230.

As noted above, one of the examples *Fair Housing* gave for conduct that would expose an interactive computer services provider to liability even with the protections afforded by CDA section 230 concerns website operators who "edit[] in a manner that contributes to the alleged illegality – such as by removing the word 'not' from a user's message reading '[Name] did *not* steal the artwork' in order to transform an innocent message into a libelous one…."  *Fair Housing*, 521 F.3d at 1169.  Any systematic silencing of counterpoints leaving only what is an allegedly defamatory message or stream of discourse would seem to represent editing that cannot be described as "unrelated to the [alleged] illegality."  *Id.*; *see also* 47 U.S.C. § 230(c)(2)(A) ("No provider or user of an interactive computer service shall be held liable on account of…any action voluntarily taken *in good faith* to restrict access to or availability of

material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected….") (emphasis added).[33]  Certainly Midley has not supported, by way of citation to precedent, its assertion that this conduct is simply "not actionable." Docket No. 104, at 16:17.  Considering that CDA section 230 is the only basis for Midley's argument that Plaintiffs cannot satisfy their burden at the second step of the anti-SLAPP analysis and that these allegations are incorporated into every one of Plaintiffs' claims – including their common law claims – Plaintiffs' case will survive this motion to the extent it is based on these allegations.

Midley also is charged with "dedicating" two or more URLs to the accusations advanced against Plaintiffs.  *See* FAC ¶¶ 24, 32, 76.  At this point, however, Plaintiffs have not demonstrated why the mere provision of a URL for a comment thread – even if dressed up as a "dedication of" such a URL – would not be considered the extension of a "neutral tool" to Midley's users.[34]  *See Fair Housing*, 521 F.3d at 1169; *see also id.* at 1174 n.37 ("Providing neutral tools for navigating websites is fully protected by CDA immunity, absent substantial affirmative conduct on the part of the website creator promoting the use of such tools for unlawful purposes."); *id.* at 1175 (indicating that "a generic text prompt with no direct encouragement to perform illegal searches or to publish illegal content" would be immune).  Beyond that, Plaintiffs allege that an Illinois federal court issued a temporary restraining order against Burke in connection with the conduct at issue in this case, requiring her to ask Midley to remove the first thread of comments at issue here.  *See* FAC ¶ 40.  In response, rather than removing the thread, Midley moved the first comment thread "from public view, keeping it active in a password-accessible area of the website, where anyone with a password can still see the

---

[33] Although it did involve "allegations of extortion based on…alleged manipulation of…review pages…by removing certain reviews and publishing others or changing their order of appearance," *Levitt v. Yelp! Inc*, No. C-10-1321, 2011 U.S. Dist. LEXIS 124082 (N.D. Cal. Oct. 26, 2011), does not appear to have involved similar allegations of purposefully removing particular commenters' posts in order to structure or protect a pre-existing allegedly defamatory message.  *See id.* at *17-29.  Nor, of course, did *Fair Housing*. Further, the Ninth Circuit does not appear to have reviewed the district court's decision in *Yelp!*.

[34] It is conceivable that, on different facts, the provision (or deletion, or restriction) of URLs could be something other than a "neutral tool."  But those facts are not present here, at least with respect to the initial provision/dedication of URLs.

entire thread." *Id.* ¶¶ 41-42.

If the mere provision of URLs for the threads represents making "neutral tools" available, the question is whether implementing password-protection for that comment thread such that it is still accessible, but only to those with passwords, can constitute "substantial affirmative conduct on the part of the website creator promoting the use of such tools for unlawful purposes." *Fair Housing*, 521 F.3d at 1174 n.37. One might be inclined, at first, to answer that question (to the extent Plaintiffs have presented it here[35]) "yes," for it allows for the further incubation of the commentary already begun in that thread – in other words, Midley would be, in that sense, "responsible" for the continued "development of the offending content," 47 U.S.C. § 230(f)(3), rather than its requested cessation. On the other hand, if the Court is indeed correct that the mere provision of a URL equates to making a "neutral tool" available to a website's users, CDA section 230 would have protected Midley from liability had it simply left the URL/comment thread where it was – in full view of the public eye. In that respect, it would be at a minimum somewhat bizarre for Midley to be at *increased* risk of liability for doing something that Plaintiffs presumably would prefer it to have done, at least as compared to leaving the comment thread in full public view.

Whether the addition of password-protection brings Midley's acts outside the friendly confines of CDA section 230, then, likely depends on how Midley operates that password regime. For instance, if it grants passwords to all of those whom request one, it seemingly would still be providing a "neutral tool." If, however, it only selectively issued passwords (or revoked those passwords after learning more about the person or entity it had issued one to), a different answer might result. Of course, none of this is in the FAC; instead, the Court faces only allegations that Midley "dedicated" certain URLs and then moved one of the offending threads behind a password-protected area. This allegation is not enough to deprive Midley of the CDA section 230 protection in

---

[35] Although the post-TRO conduct is part of the FAC, it is somewhat unclear whether it is activity giving rise to Plaintiffs' claims. As explained above, to the extent URLs are specifically referenced in Plaintiffs' claims, they are largely the subject of a general "dedication" allegation. *See* FAC ¶¶ 24, 32, 76. However, in paragraph 32 of the FAC, Plaintiffs also specifically allege that Midley encouraged, aided and facilitated the attacks by keeping one of the threads active after Burke/BeenBurned requested that it be removed as violative of the Illinois federal court's TRO. *See id.* ¶ 32. As noted herein, Plaintiffs have incorporated paragraph 32 into each of their claims in this case.

connection with URL-related conduct.

Plaintiffs also allege that Midley incentivized and rewarded Burke/BeenBurned for her comments. *See* FAC ¶¶ 17, 27-28, 76.[36] There is *nothing* in *Fair Housing* which suggests "incentivizing" and/or "rewarding" comments from third parties can override CDA section 230's protections.[37] While there might have been less of an expectation that the Ninth Circuit would consider such a prospect in that case – coming, as it was, in the context of a general challenge to a website's structure and purposes – it is not inconceivable that the court would have considered it, if it thought it germane. Obviously, a user of the website in question in *Fair Housing* could have been "rewarded" for his, her or its discriminatory content by virtue of actually obtaining a roommate who fit within the confines of the user-defined acceptable, if discriminatory, characteristics. For these reasons, the Court questions whether general "reward systems" are enough to find the necessary "encouragement" under *Fair Housing* or if, instead, they are simply one of the examples of conduct present in "close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality," but which ultimately "must be resolved in favor of immunity." *Fair Housing*, 521 F.3d at 1174.

Certainly, *Fair Housing* supports the view that "encourag[ing] illegal content" will lose you immunity, *id.* at 1175, but Plaintiffs have not alleged any facts that tend to show that Midley encouraged *illegal* content, as opposed to content in general. *See id.* at 1174 ("The fact that Roommate encourages subscribers to provide *something* in response to the prompt is not enough to make it a 'develop[er]' of the information under the common-sense interpretation of the term we adopt today."). Midley allegedly bestowed

---

[36] To be clear, Plaintiffs' attempt in paragraphs 31 and 76 of the FAC to assert that Burke/BeenBurned had "special privileges" or was rewarded simply by virtue of the alleged fact that her posts were not edited or deleted whereas Plaintiffs' posts (and posts favorable to Plaintiffs) were edited or deleted is not a workable distinction. *Fair Housing* makes clear that interactive computer services providers cannot be held liable, generally speaking, for deleting some posts and not others, yet that is precisely what Plaintiffs' "special privileges" theory would mean. That is not to say that targeted efforts at editing or deleting posts cannot take such activity outside of the protections afforded by CDA section 230, but mere editing/deleting cannot possibly be transformed into a "special privileges" theory, even if rewarding/incentivizing third-party content-providers could otherwise potentially take an interactive computer services provider outside of CDA section 230's protections.

[37] Midley appears to go too far, however, when it takes the position in its first brief on this motion that "mere solicitation or inducement is not actionable in the Ninth Circuit." Docket No. 48, at 17:22-23. To support this rather broad proposition, Midley cites only to footnote 19 on page 1166 of the *en banc Fair Housing* decision. That footnote does not support Midley's assertion; it only points out that the defendant in that case did "much more than encourage or solicit." 521 F.3d at 1166 n.19.

"special privileges" on Burke/BeenBurned to "(1) password-accessible functions and forums on the site, (2) initiate discussion threads (like the owners and managers of the website), and (3) be remunerated for her commentary…about legitimate businesses by being given the ability…to sell her own products in a coveted, invitation-only, location on PurseBlog called the 'Marketplaza.'"   FAC ¶ 27; *see also id.* ¶ 28 ("In addition, BeenBurned is given authority to start defamatory and anti-competitive threads about other businesses.").   However, absent some *factual* allegation that Midley bestowed these privileges on Burke/BeenBurned because of the *nature* of her comments, this Court cannot conclude, even under a Rule 12(b)(6)-like standard, that Midley encouraged *illegal* content, as opposed to simply encouraging *content*, even assuming that a "reward system" would be enough to rule out CDA section 230 immunity.

Finally, Plaintiffs allege that Midley's owner, Vlad Dusil, added his own comments in order to "stoke the fires" within the comment threads.  *See id.* ¶¶ 32, 39, 76, 108.  There is no question that Midley would not have immunity for anything that it, by way of Dusil, contributed to the commentary.[38]  *See Fair Housing*, 521 F.3d at 1162-63, 1165-69.   The FAC's allegations in this regard, however, are not particularly enlightening.  The clearest they get are the assertion that Dusil "quot[ed] and respond[ed] to other posts in the threads," *id.* ¶ 39.[39]

Plaintiffs have not given the Court any reason to conclude, however, that even that conduct could somehow render Midley the "owner" or otherwise responsible for any later-added (or, especially, earlier) illegal content that a third party user adds through the neutral tool of a message board or forum, even if, in some general sense, Dusil's

---

[38] To the extent Plaintiffs seek to rely on the comments of people other than Dusil whom they assert were the website's "moderators" or otherwise served as agents of Midley, *see, e.g.*, ¶ 76, they have not provided sufficient factual allegations to demonstrate that Midley should be deemed associated with or responsible for such conduct (notwithstanding the facts that 1) in their original Opposition brief they purported to have *evidence* of such relationships, 2) they knew that CDA section 230 and *Fair Housing* would be a center-piece of Midley's anti-SLAPP motion, and 3) *thereafter* amended their allegations by way of the FAC). Although Plaintiffs believe their agency-based allegations are sufficiently "factual" for purposes of a Rule 12(b)(6)-type analysis, they have not explained why that would be the case considering the distinction *Twombly* and *Iqbal* drew between factual and conclusory allegations.  Were allegations related to Midley's alleged agents the only basis for this aspect of Plaintiffs' case, it would not be sufficient to survive a Rule 12(b)(6)-like analysis of whether Midley was a content provider in addition to simply serving as an interactive computer services provider.

[39] *See* Footnote 41, *infra*.

comments had the effect of "keeping the threads active and stimulating further conversation." *Id.*   As such, even if Dusil's own commentary would be one further reason that Plaintiffs' common law claims will survive this anti-SLAPP analysis, any such liability would be limited only to his own comments, not the contents of others' comments.[40]  Given the fact that at least claims based upon Dusil's own added comments will survive this proceeding, however, the parties might consider whether Plaintiffs should be able to take discovery into connections between other commenters and Midley (by way of a moderator relationship, some other agency-based relationship, or otherwise).

III.  Fees

Insofar as Midley may have found partial success in its anti-SLAPP motion, at least some measure of a fee award may be mandatory.  The proper measure of those fees – and the proceedings that should be contemplated in the course of that measuring process – should be the subject of limited further briefing once the parties have digested the instant ruling.

However, as noted below, there is a single issue which the parties probably should address – *i.e.* when a court finds that part of a cause of action could be stricken under anti-SLAPP law but a remaining portion cannot, does that result in the entire claim being stricken, or merely part of it, or none of it.

IV.  Conclusion

The Court holds that the Midley cannot prevail on its anti-SLAPP motion as to Plaintiff's federal claims under the Lanham Act and for declaratory relief, as well as Plaintiff's causes of action under Illinois law.  The Court has further conducted an anti-SLAPP analysis of the common law claims in the FAC.  It concludes, based on the

---

[40] There was some initial limited suggestion in Midley's original opening brief that Midley would attempt to challenge Plaintiffs' ability to demonstrate the falsity of the comment threads' postings.  *See* Docket No. 48, at 13:13-15.  *But see, e.g., id.* at i:13-16, 1:11-14, 15:13-17.  Yet, as the Court has emphasized herein, Midley's argument for why Plaintiffs cannot satisfy their burden at the second step of the anti-SLAPP analysis overwhelmingly focuses upon its belief that it has immunity under CDA section 230.  Although it has argued under a Rule 12(b)(6)-type standard for the conclusion that Plaintiffs cannot get past section 230's protections, it has *not* argued that Plaintiffs have not properly pled (under a Rule 12(b)(6) approach) one or more claims based upon Dusil's own alleged comments in the thread(s).  As noted earlier, a deficiency-on-the-elements is one recognized flaw in a plaintiff's case that can lead to a successful anti-SLAPP motion.  *See, e.g., Mindys Cosmetics*, 611 F.3d at 598-99.  By dedicating its focus to the CDA section 230 defense, however, Midley has not taken that approach here.

pleadings,[41] that Plaintiffs have demonstrated a probability of overcoming Midley's CDA section 230-based defense, but only to the extent that: 1) Midley engaged in the selective editing and deletion of Plaintiffs' own posts/comments (or the comments/posts of others attempting to add a favorable view of Plaintiffs and their activities) and/or 2) Midley, by way of Dusil, added its own comments to the comment threads.  Plaintiffs' common law claims may proceed to the extent they are limited in that regard.  As such, Midley's anti-SLAPP motion is granted in part and denied in part.

Any party may arrange with the Court Clerk, if one or both of them see the need or have the desire, to set for any available oral argument date in August, a hearing in which they may address only the issue of whether parts of causes of action may survive anti-SLAPP analysis or whether, instead, anti-SLAPP analysis is, of necessity, an all-or-nothing proposition.  Alternatively, if the parties are in agreement, they may provide supplemental briefing on the question, limited to simultaneous opening briefs of 7 pages, with simultaneous responsive briefs of 5 pages.  In considering their options, the parties should have in mind 1) that the second step of the anti-SLAPP analysis in this case focused not on whether Plaintiffs probably would prevail with respect to the simple merits of their affirmative claims, but whether instead they would be able to overcome an affirmative defense based upon section 230 of the Communications Decency Act, and 2) that the Ninth Circuit's *en banc Fair Housing* decision made clear that section 230 immunity itself is not necessarily an all-or-nothing proposition.

Additionally, this Court sets a status conference hearing date for August 29, 2013, at 830 a.m.  The parties can appear telephonically by advanced arrangement with the Court Clerk.

---

[41] Again, the Court cannot conduct an evidence-based anti-SLAPP analysis at this stage because Plaintiffs have not had an opportunity to engage in discovery.  *See Metabolife Int'l, Inc. v. Wornick*, 264 F.3d at 845-46.